Corey Jermo CONNER *v.* STATE of Arkansas

CR 97-1426                                                      982 S.W.2d 655

Supreme Court of Arkansas
Opinion delivered October 8, 1998

[Petition for rehearing denied November 12, 1998.]

*W. Ray Nickle*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. The appellant, Corey Jermo Conner, was sentenced to life imprisonment without parole for the capital murder of Darrell Robinson. On appeal, Conner challenges the sufficiency of the evidence to support his conviction, the denial of his motion to suppress two custodial statements, the court's refusal to read a non-model instruction on accomplice liability, and the effectiveness of his trial counsel. We affirm on all points.

On July 18, 1996, Darrell Robinson was shot and killed on Winchell Street in West Memphis. One witness, Michael Cox, saw Conner and two other males fire multiple gun shots at Robinson. Sometime later that evening, Conner voluntarily appeared at

the police station where he was arrested and charged, as an adult, with capital murder.

The next day, July 19, 1996, Conner turned seventeen years old. Around 10:00 that morning, Conner executed a form waiving his *Miranda* rights and gave a tape-recorded statement to Detectives West and Burch. At the time, Conner weighed approximately 220 pounds, stood six feet three inches, was in the tenth grade, and had no prior experience with the criminal-justice system. During the questioning, Detectives West and Burch used the "good cop" " bad cop" method to elicit information from Conner. Detective West falsely claimed that four or five witnesses reported seeing Conner with a gun at the time of the shooting. Conner contended that neither he nor his two friends fired shots at the victim. After warning Conner that only one of the three defendants would be able to obtain a plea bargain, Detective Burch, the "bad cop," made the following statements:

> [D]o you know what will happen if you are proven guilty of capital murder? . . . They strap you to a table and stick a needle in your arm and you go to sleep and you never wake up, that's what happens, and I don't believe a damn thing you've said since you started opening your mouth, you follow me?

> \* \* \*

> We can save your life, we can save your life. We can be responsible for strapping you on the table, it's up to you. Now if you want to get a little smart between your ears, and start telling the truth, as you see it, then Eddie and I can work with you and save your life. I am not promising you, but we can work with you and I am a man of my word and I won't break it, you follow me?

> \* \* \*

> I can be the most meanest son of a bitch that you ever walked across, and I don't believe what you are saying.

> \* \* \*

> The others, are going to burn, bubba, they are going to burn in hell, they are going to be strapped to a damn table, a damn needle stuck in their arm, and they are going to be gone, your chance, I am going to offer it to you, you blow it, you ain't getting another

one, because I got a whole lot to do today, and I am not going to set up here and plea with you to save your life, do you follow me?

\* \* \*

Last chance, no more. Now, Eddie, I am a son of a bitch, do you follow me? I will give you a chance, now I'll bust my ass to help you if you try to help yourself. You don't, I'll burn your ass in a heart beat, that's the way I am, that's the way I work.

\* \* \*

As far as I am concerned, you're a damn murderer. You deserve to be strapped to a table and stick a needle up your arm. If this new Huckabee have his way, your new governor, he's going to reinstate the electric chair, he ain't going this way no more. That's one of Huckabee's promises for law and order. I want to hear the truth. Start from the time that you got on Winchell Street and what took place, because I want to know, I want it hear it from your mouth.

After hearing these comments, Conner did not change his statement.

After the interview, which lasted from 10:07 to 10:33 a.m., Conner was placed in a holding cell where he made several phone calls. During this time, Conner spoke to his friend, Andrew McDaniel, who urged Conner to tell the truth. Around 1:30 or 2:00 p.m., Conner asked to speak with Detective West. Detective West brought Conner back to his office to make a second recorded statement. Detective Burch was not present, and Detective West did not repeat the *Miranda* warnings. During this second statement, Conner admitted that he had a gun but claimed that he ran away without firing a single shot as soon as the shooting began. Although Conner claimed that he threw the gun in the river by Airport Road, the police were unable to retrieve the gun. Conner completed his second statement at 2:50 p.m.

Conner and two others were subsequently charged with capital murder. Conner was tried separately, and a jury found him guilty of premeditated and deliberate capital murder. Because the State waived the death penalty, the court sentenced Conner to life imprisonment without parole.

## I.   Sufficiency of the Evidence

Conner raises four issues on appeal, including his third argument that there was insufficient evidence to support his conviction of capital murder. As we have said previously, double jeopardy considerations require us to consider a challenge to the sufficiency of the evidence prior to all other arguments asserted on appeal. *Britt v. State*, 334 Ark. 142, 974 S.W.2d 436 (1998); *Welch v. State*, 330 Ark. 158, 955 S.W.2d 181 (1997).

At the conclusion of the State's case-in-chief, Conner made the following motion for a directed verdict:

> Your Honor, I would ask at this time since the State has rested, that a directed verdict be granted to the defendant. Based on the sum of the evidence presented, there would be no way that reasonable minds could differ as to the guilt or innocence of this defendant, and I ask for a directed verdict.

At the conclusion of all evidence, Conner renewed his motion for a directed verdict with the following statement:

> Your Honor, at this time I would ask for a directed verdict based upon the evidence brought before the court, including the State's case in chief as well as the defense's presentation. There is no way reasonable minds could differ as to the guilt or innocence of Mr. Conner, and I would ask the Court direct a verdict.

█   In order to preserve a challenge to the sufficiency of the evidence, an appellant must make a specific motion for a directed verdict which advises the trial court of the exact element of the crime that the State has failed to prove. *Fultz v. State*, 333 Ark. 586, 972 S.W.2d 222 (1998); *Dulaney v. State*, 327 Ark. 30, 937 S.W.2d 162 (1997). In contrast, a general motion that merely asserts that the State has failed to prove its case is inadequate to preserve the issue for appeal. *See, e.g., Crisco v. State*, 328 Ark. 388, 943 S.W.2d 582 (1997) (claiming that the State failed "to prove a prima facie case"); *Lovelady v. State*, 326 Ark. 196, 931 S.W.2d 430 (1996) (declaring that the State "failed to meet its burden of proof"). As in *Crisco* and *Lovelady*, Conner made a general motion for a directed verdict asserting that the State failed to

prove its case. Accordingly, we hold that Conner's sufficiency challenge is not properly preserved for appeal.

## II. Motion to Suppress

Next, Conner makes four arguments in support of his contention that the trial court erred when it denied his motion to suppress his two custodial statements.

### A. Parental Consent and Presence

■ First, Conner argues that the trial court should have suppressed his statements because his mother did not consent to his waiver of his right to counsel, nor was she present during the questioning. Arkansas Code Annotated § 9-27-317(a)(3) (Repl. 1998), provides that during "a delinquency or family in need of services hearing" a parent or guardian must consent to the juvenile's waiver of his or her right to counsel. We, however, have clarified that this statutory provision applies only when the individual is charged in juvenile court, and not when he or she is charged as an adult in circuit court. *Misskelley v. State*, 323 Ark. 449, 915 S.W.2d 702 (1996), *cert. denied*, 117 S.Ct. 246 (1996); *Sims v. State*, 320 Ark. 528, 900 S.W.2d 508 (1995). Because Conner was charged as an adult in circuit court, the police were not required to obtain parental consent to the waiver of his right to counsel.

■ ■ In contrast, Ark. Code Ann. § 9-27-317(g)(2) provides that, "[n]o law enforcement officer shall question a juvenile who has been taken into custody for *a delinquent act* or *criminal offense* if the juvenile has indicated in any manner that he . . . [w]ishes to speak with a parent or guardian or to have a parent or guardian present" (emphasis added). Thus, unlike the right to parental consent to a waiver, a juvenile has the right to speak to a parent or have a parent present during questioning in juvenile and criminal proceedings. *See Isbell v. State*, 326 Ark. 17, 931 S.W.2d 74 (1996). The juvenile, however, and not the parent or guardian must invoke this statutory right. *Id.* Although there is evidence in the record that Conner's mother requested to speak to her son, there is no evidence that Conner himself invoked his statutory

right to have a parent or guardian present during questioning. Accordingly, we find no merit to this point on appeal.

### B. Knowing and Intelligent Waiver

■ Next, Conner contends that his statements should have been suppressed because they were not the product of a knowing and intelligent waiver of his *Miranda* rights. As we have explained in the past, the relevant inquiry here is whether Conner waived his rights with "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Smith v. State*, 334 Ark. 190, 974 S.W.2d 427 (1998); *Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335 (1998). We make this determination by reviewing the totality of the circumstances surrounding the waiver including the age, experience, education, background, and intelligence of the defendant. *Sanford, supra; Hart v. State*, 312 Ark. 600, 852 S.W.2d 312 (1993). Furthermore, we will reverse a trial court's ruling on this issue only if it was clearly erroneous. *Smith, supra; Davis v. State*, 330 Ark. 76, 953 S.W.2d 559 (1997).

At the time Conner waived his *Miranda* rights, he was seventeen years old and in the tenth grade. The police officers read Conner his *Miranda* rights, and Conner executed a waiver form during a tape-recorded interview that was reviewed by the trial court. There is also no indication in the record that Conner was either unintelligent, or unable to understand his rights.

In reply, Conner insinuates in his brief that he had less than an average IQ because he attended an "alternative school." During the *Denno* hearing, Conner's mother explained that Conner attended an alternative school because he was expelled from public school for breaking in line in the lunch room, and because the deacon of their church worked at the alternative school.

■ Relying upon *Ingram v. State*, 53 Ark. App. 77, 918 S.W.2d 724 (1996), Conner also contends that because he was a juvenile, the police officers should have taken additional measures to ensure that he understood his rights. This argument has no merit because *Ingram* dealt with the additional safeguards that are required by Ark. Code Ann. § 9-27-317(a) during a delinquency

proceeding. As previously mentioned, these safeguards do not apply when the juvenile is tried as an adult. Moreover, in *Sanford, supra*, we explained that the age of the defendant alone is not sufficient to render a waiver unintelligent or unknowing. In fact, we have previously held that defendants younger than Conner were capable of making a knowing and intelligent waiver of their rights. *See, e.g., Sanford, supra* (sixteen years old); *Oliver v. State*, 322 Ark. 8, 907 S.W.2d 706 (1995) (fifteen years old); *Douglas v. State*, 286 Ark. 296, 692 S.W.2d 217 (1985) (fifteen years old).

■ Based on the totality of the circumstances, we conclude that the trial court did not err when it held that Conner knowingly and intelligently waived his rights.

## C. *Voluntariness*

■ ■ Next, Conner claims that his statements were involuntary. A statement is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Britt v. State, supra; Sanford, supra*. In making this determination, we review the totality of the circumstances, and reverse the trial court only if its decision is clearly erroneous. *Id.* Relevant factors include the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of mental or physical punishment. *Id.* Two other pertinent factors are the statements made by the interrogating officers and the vulnerability of the defendant. *Kennedy v. State*, 325 Ark. 3, 923 S.W.2d 274 (1996); *Oliver v. State*, 322 Ark. 8, 907 S.W.2d 706 (1995).

At the time of his statements, Conner was seventeen years old, he was in the tenth grade, and he was physically larger than the two detectives who interviewed him. We also find it important that Conner had the opportunity to rest before each interview, that the interviews were relatively short, and that there was no evidence of physical punishment or threats.

■ We, however, are greatly troubled by the detectives' use of the "good cop"—"bad cop" technique while questioning Conner. Specifically, we cannot condone the severity of the state-

ments Detective Burch made to Conner, who was only seventeen years old and a stranger to the criminal-justice system. We have previously held that the police may use psychological tactics and coercive statements in eliciting a custodial statement from the accused so long as the means employed are not calculated to procure an untrue statement, and the accused's free will is not completely overborne. *See, e.g., Pyles v. State*, 329 Ark. 73, 947 S.W.2d 754 (1997) (questioning the accused's truthfulness); *Misskelley, supra* (showing the accused gruesome photos of the victim and using a psychological diagram); *Noble v. State*, 319 Ark. 407, 892 S.W.2d 477 (1995) (appealing to the defendant's religious beliefs). Thus, instead of focusing upon the severity of the officer's statements, we must carefully scrutinize the impact of those statements on the accused.

During the *Denno* hearing, the trial judge reviewed the tapes of both interviews to evaluate the tone of voice used by the detectives and, more importantly, Conner's reaction to their statements. After reviewing the tape, the court concluded that Conner:

> showed no fear, he was calm, he was self-assured and certain of his answers, including the final answer when the officer had said this is your last chance, and he repeated what he had said before without hesitation. He didn't sound shaken; he sounded self-assured and confident in what he was saying and did not, in the court's opinion, appear to be threatened.

In addition to the court's characterization of Conner's demeanor, we find it particularly persuasive that Conner did not change his statement immediately after Detective Burch's statements. Instead, Conner waited three hours before he approached Officer West about making a second statement. During this three-hour hiatus, Conner spoke to a friend, Andrew McDaniel, who urged him to tell the truth. Thus, Conner's decision to revise his prior statement could have been the product of his friend's advice to tell the truth, rather than the product of Detective Burch's statements. Based on Conner's reaction to the detective's statements, the delay between statements, and the advice Conner received from a friend before giving his second statement, we hold that the trial court did

not clearly err when it found that Conner's free will was not completely overborne.

Conner also challenges Detective West's false assertions that four of five witnesses reported seeing him with a gun at the time of the murder. In *Frazier v. Cupp*, 394 U.S. 731 (1969), an officer untruthfully told the accused that his co-defendant had confessed to the crime. The Supreme Court held that the false statement was "insufficient in our view to make this otherwise voluntary confession inadmissible." *Id.* Likewise, we have said that a misrepresentation of fact does not render a statement involuntary "so long as the means employed are not calculated to procure an untrue statement and the confession is otherwise freely and voluntarily made with an understanding by the accused of his constitutional rights." *Gardner v. State*, 263 Ark. 739, 569 S.W.2d 74 (1978) (officer falsely told the accused that he could revoke his statement once he obtained an attorney); *see also Kennedy v. State*, 325 Ark. 3, 923 S.W.2d 274 (1996) (the accused and his mother were misled about the scope of the police questioning); *Tucker v. State*, 261 Ark. 505, 549 S.W.2d 285 (1977) (accused was misled to believe that a trace metal detection test and a latent fingerprint linked him to the crime). Although Detective Burch exaggerated the number of witnesses who had seen Conner with a gun, one witness, Michael Cox, did in fact see Conner aim and fire a gun at the victim. Hence, we cannot say that the misrepresentation of the number of witnesses who saw Conner with a gun is enough, standing alone, to render his statement involuntary.

Finally, Conner contends that the detectives made false promises of leniency in order to obtain his statement. In *Pyles v. State*, 329 Ark. 73, 947 S.W.2d 754 (1997), we recently summarized our analysis of an allegedly false promise of leniency as follows:

> If a police official makes a false promise which misleads a prisoner, and the prisoner gives a confession because of that false promise, then the confession has not been voluntarily, knowingly and intelligently made. In determining whether there has been a misleading promise of reward we look at the totality of the circumstances. The totality is subdivided into two main components, first, the statement of the officer and second, the

vulnerability of the defendant. Because these two factors create such a multitude of variable facts, it has been impossible for us to draw bright lines of substantive distinction.

(quoting *Davis v. State*, 257 Ark. 388, 517 S.W.2d 515 (1974)). If, during the first step, we decide that the officer's statements are unambiguous false promises of leniency, there is no need to proceed to the second step because the defendant's statement is clearly involuntary. *See Pyles, supra; Durham v. State*, 320 Ark. 689, 899 S.W.2d 470 (1995); *Hamm v. State*, 296 Ark. 385, 757 S.W.2d 932 (1988). If, however, the officer's statement is ambiguous making it difficult for us to determine if it was truly a false promise of leniency, we must proceed to the second step of examining the vulnerability of the defendant. *See Pyles, supra; Durham, supra; Hamm, supra*. Factors to be considered in determining vulnerability include: 1) the age, education, and intelligence of the accused; 2) how long it took to obtain the statement; 3) the defendant's experience, if any, with the criminal-justice system; and 4) the delay between the *Miranda* warnings and the confession. *Hamm, supra; Free v. State*, 293 Ark. 65, 732 S.W.2d 452 (1987).

For example, in *Pyles* the officers promised that they would "help [the defendant] in every way in the world," and that they would "do everything in the world . . . for him." *Pyles, supra*. In as much as we could not say that these statements were truly false, we proceeded to the second stage of examining the defendant's vulnerability. *Id.* Because the weeping defendant held the officer's hands during the interrogation, and he was "emotional and tired from a long interrogation," we concluded that "the officer's actions constituted a false promise that resulted in an involuntary confession." *Id.*

Starting at the first step, we must determine whether the detectives's assertion that they would save Conner's life was a false promise of leniency. The concurrence and the dissent challenge the detectives's authority to make such a promise. At the outset, we question the propriety of addressing the issue at this time because neither party challenged, either below or on appeal, the detectives's authority to promise Conner leniency. *See Tabor v. State*, 333 Ark. 429, 971 S.W.2d 227 (1998); *Beyer v. State*, 331 Ark. 197, 962 S.W.2d 751 (1998)(holding that even constitutional

arguments must be made below before we will address them on appeal).

Furthermore, we do not think that who made the promise is relevant so long as the promise is eventually honored by the State. In fact, we have never previously held, as the concurrence recommends, that a promise is false simply because the person making it had no authority to do so. For example, in *Tippitt v. State*, 285 Ark. 294, 686 S.W.2d 420 (1985), investigating officers and not the prosecutor promised Tippitt that he would not be charged with attempted capital murder in return for his statement, which was used against him at his trial on charges of aggravated robbery and theft. *Id.* On appeal, we held that the trial court properly refused to suppress Tippitt's statement because Tippitt "struck a bargain [with the investigating officers], which was closely related to a plea bargain, and both sides kept their promises." *Id.*; *see also King v. State*, 317 Ark. 293, 877 S.W.2d 583 (1994) (holding that "it is a *false* promise that renders a confession involuntary [citing *Tippitt*] and here appellant has readily conceded the case–worker arranged for psychological treatment [as promised]")(emphasis in the original). As in *Tippitt*, Conner gave his statement after the detectives promised to save his life, and the State honored that promise by waiving the death penalty. Under these facts, we cannot say that the promise of leniency was false.

In reply, the concurrence asserts that *Tippitt* is not binding precedent because "[n]o such 'deal' or 'bargain' was struck in the instant case, and *Tippitt* was clearly limited to its facts." We disagree. We can find no case where we have limited *Tippitt* to its facts. Even if we had, the facts of the two cases are virtually identical. The only difference is that in *Tippitt* the promise of leniency was explicit while in this case the promise was implicit. We, however, do not find this distinction to be determinative because the relevant inquiry is whether the promise of leniency was *false*, and not whether it was implied or whether the bargaining official had the authority to make the promise. Instead, according to *Tippitt*, and our well-established precedent, a promise of leniency is false when it is dishonored. *See, e.g., Teas v. State*, 266 Ark. 572, 587 S.W.2d 28 (1979) (officer told the defendant,

who later received the maximum sentence, that he would reduce the bond, recommend leniency, and possibly dismiss the case); *Freeman v. State*, 258 Ark. 617, 527 S.W.2d 909 (1975)(prosecutor told a defendant, who later received a life sentence, that a confession "would not result in more than twenty-one years' incarceration"). In other words, we have consistently held that a statement is involuntary when the defendant relies to his detriment on a promise of leniency that is never honored. There was no detrimental reliance in this case because Conner got the benefit of his bargain, *i.e.*, the death penalty was waived in exchange for his statement.

Finally, we are not persuaded by the Maryland, California, and Utah cases cited by the concurrence because the voluntary analysis used in those jurisdictions is significantly different than ours. Specifically, these states hold that *all* promises of leniency (whether implicit, explicit, honored, dishonored, or otherwise) are inherently coercive, and thus the defendant's statement must be suppressed if the promise of leniency was a "motivating factor" or a "motivating cause" of the confession. *See People v. Vasila*, 45 Cal. Reptr. 2d 355 (Cal. Ct. App. 1995); *Reynolds v. State*, 610 A.2d 782 (Md. 1992); *State v. Strain*, 779 P.2d 221 (Utah 1989); *People v. Johnson*, 450 P.2d 265 (Cal. 1969).

In contrast, as articulated above, we have held that a statement should be suppressed only if the promise of leniency or reward was false. Here, the State honored the detectives's promise to "save Conner's life" by waiving the death penalty. There was no detrimental reliance. Under such circumstances, we cannot say that the promise of leniency was false. Accordingly, there is no need for us to proceed to the second stage of examining Conner's vulnerability.

For these reasons, we cannot say that the trial court was clearly erroneous when it found that Conner's statements were voluntarily given.

### D. Repetition of Miranda Warnings

The final issue regarding the suppression motion is whether Officer West should have repeated the *Miranda* warnings

before he obtained Conner's second statement. In *Wyrick v. Fields*, 459 U.S. 42 (1982), the United States Supreme Court held that *Miranda* warnings must be repeated only when the circumstances have changed so seriously that the accused's answers are no longer voluntary, or the accused is no longer making a knowing and intelligent relinquishment or abandonment of his rights. Although a totality-of-the-circumstances test is required, the Court, in *Wyrick*, was particularly influenced by the fact that the accused initiated the second interrogation. We have also acknowledged that the lapse between warnings as well as the number of prior warnings are relevant concerns. *See, e.g., Bryant v. State*, 314 Ark. 130, 862 S.W.2d 215 (1993) (one-month lapse and five prior warnings); *Barnes v. State*, 281 Ark. 489, 665 S.W.2d 263 (1984) (three-day lapse and three prior warnings).

In this case, Conner received the *Miranda* warnings approximately three hours before his second statement. We also find it persuasive that Conner initiated the second contact, which was more of an interview than an interrogation. Accordingly, we affirm the trial court's ruling that the officers were not required to repeat the *Miranda* warnings before Conner gave his second statement.

For the reasons articulated above, we affirm the trial court's denial of Conner's motion to suppress both custodial statements.

### III. Jury Instructions

For his third argument on appeal, Conner contends that the trial court erred when it refused to give the following non-model jury instruction:

> The mere presence of a person at the scene of a crime is not proof of their guilt. Further, evidence which is merely suspicious in nature, or if it is as consistent with innocence as guilt, is insufficient.

Instead of the above instruction, the court gave the model jury instruction on accomplice liability, AMI Crim. 2d 401, which states in relevant part that:

> An accomplice is one who directly participates in the commission of an offense or who, with the purpose of promoting or facilitating the commission of the offense, solicits, advises, encourages, or coerces the other person to commit the offense, or aids, agrees to aid, or attempts to aid the other person in planning or committing the offense.

On appeal, Conner contends that the model instruction was inadequate because it failed to explain that mere presence at the crime scene does not make one an accomplice. We have rejected this argument on numerous occasions because AMI Crim. 2d 401 adequately informs the jury of what conduct gives rise to accomplice liability, and thus it would be redundant to state what conduct does not give rise to accomplice liability. *Calloway v. State*, 330 Ark. 143, 953 S.W.2d 571 (1997); *Williams v. State*, 329 Ark. 8, 946 S.W.2d 678 (1997); *Webb v. State*, 326 Ark. 878, 935 S.W.2d 250 (1996). Likewise, the second sentence of Conner's proffered instruction was unnecessary and redundant because the court gave the jury AMI Crim. 2d 106 on circumstantial evidence and AMI Crim. 2d 110 on reasonable doubt. Accordingly, we affirm the trial court's refusal to give the proffered jury instruction.

### IV. Ineffective Assistance of Counsel

Lastly, Conner argues that he was deprived of effective assistance of counsel. It is well settled that we may consider this issue on direct appeal only when the appellant has raised it below, either during the trial or in a motion for a new trial. *Dougan v. State*, 330 Ark. 827, 957 S.W.2d 182 (1997); *Walker v. State*, 330 Ark. 652, 955 S.W.2d 905 (1997); *Smith v. State*, 328 Ark. 249, 943 S.W.2d 234 (1997). Conner did neither, therefore, it is impossible for us to consider the issue at this time.

### V. Arkansas Supreme Court Rule 4-3(h)

Pursuant to Ark. S. Ct. R. 4-3(h), the record was reviewed for all rulings adversely decided to Conner but not argued on appeal, and no reversible errors were found.

For these reasons, we affirm.

Brown, J., concurs.

Newbern and Thornton, JJ., dissent.

Robert L. Brown, Justice, concurring. I concur in all aspects of the majority opinion except one. The opinion concludes that the police officers' assertions that they could save Conner's life were not false in light of the fact that the State ultimately chose to waive the death penalty. Does that contingency action by the State render the promises true? The majority seems to be saying that police officers can promise leniency as an incentive for a confession with impunity, so long as the State, even if it is by chance, ultimately reduces the charge. I disagree that the pure happenstance of a reduction in the offense charged can justify or excuse a promise by police officers that otherwise would be misleading.

We have no idea whether the officers in this case had anything to do with the prosecutor's decision to waive the death penalty. Probably, they did not, but in any event that is a decision that rests solely with the prosecutor or the grand jury, not law enforcement. *See* Ark. Const. amend. 21, § 1. *See also State v. Knight*, 318 Ark. 158, 884 S.W.2d 258 (1994).

The majority relies on *Tippitt v. State*, 285 Ark. 294, 686 S.W.2d 420 (1985), for its conclusion, but that case does not decide the issue of whether a promise needs to be *bona fide* or within the authority of police officers to be permissible. In *Tippitt*, the trial court refused to exclude a statement which was obtained by a police officer's promise not to charge the appellant with attempted capital murder. In rather lukewarm language, we said that "[u]nder the facts and circumstances of this case, when considered in their totality, we think the trial court was correct in admitting the statement." We then added: "The appellant struck a bargain, *which was closely related to a plea bargain*, and both sides kept their promises. Most likely the deal was a wise one for the appellant. In any event we can find no prejudicial error." *Tippitt*, 285 Ark. at 295, 686 S.W.2d at 421 (emphasis added). No such "deal" or "bargain" was struck in the instant case, and *Tippitt* was clearly limited to its facts. It is not precedent for the issue confronting us

today, since there was clearly no deal between Conner and the interrogating officers.

The Maryland Supreme Court has recognized the important distinction between a promise of leniency made by a police officer to an accused during a custodial interrogation and a promise of leniency made by a prosecuting attorney in the context of a plea bargain. *See Reynolds v. State*, 610 A.2d 782 (Md. 1992). The Maryland court stated that although courts abhor promises of leniency made by state agents to an accused in custodial interrogation, they permit and even encourage promises of reduced charges or lower sentences made by the prosecuting attorney to induce defendants to plead guilty. *See Id.* And it is an accused's "sensitivity to inducement while in custody and the potential impact of the promise" that renders a confession under such circumstances inadmissible. *Id.* at 787.

Two other state courts have dealt with factual situations similar to the case at bar. In *State v. Strain*, 779 P.2d 221 (Utah 1989), the Utah Supreme Court held improper a police officer's threat to charge the accused with first-degree murder and possible execution and his personal guarantee that he would only charge him with second-degree murder if the accused admitted his involvement. Although the court stated that the police officer's statements crossed the line, it remanded the case because the record was not sufficiently developed to consider the totality of the circumstances.

And in *People v. Johnson*, 450 P.2d 265 (Cal. 1969), the police officer threatened the defendant with the gas chamber and repeatedly called him a liar. Implicit in the threat was the promise that if the defendant talked, he would not face the death penalty. The California Supreme Court reversed the judgment and stated that this involved more than merely pointing out to the suspect a consequence that flows naturally from telling the truth.

One jurisdiction has gone so far as to hold that it makes no difference whether the promise of the police officers actually comes true. In *People v. Vasila*, 45 Cal. Rptr.2d 355 (Cal. Ct. App. 1995), police officers promised an accused that they would release him on his own recognizance and not institute federal

prosecution for his gun offense in exchange for inculpatory evidence. A confession resulted. The State argued that the confession was voluntary because the police officers had kept their promises, and that only "false" promises of leniency are coercive. The California court disagreed and said:

> This case did not involve an arms-length negotiation of testimony for consideration or a plea bargain. In fact, the prosecutor was contacted and refused to enter into such an agreement. Instead, defendant was given bald promises that, if he provided the necessary information, he would not be prosecuted federally and would be released from custody. The converse was also threatened.

*Vasila*, 45 Cal. Rptr.2d at 360.

The California court then went further and determined that the promise of leniency was improper because the issue is not whether "a commitment was honored, but rather whether governmental agents have coerced a citizen to give testimony against himself." *Vasila*, 45 Cal. Rptr. 2d at 361. Thus, whether a promise is kept is irrelevant because the promise itself constitutes improper police coercion. The *Vasila* court considered this factor in the totality of the circumstances of whether the promise was the motivating factor for the confession, and it excluded the statement.

I conclude that a misleading promise of leniency is a circumstance that should be factored into the equation of whether the will of an accused was overborne. *See Leach v. State*, 311 Ark. 485, 845 S.W.2d 11 (1993); *Davis v. State*, 275 Ark. 264, 630 S.W.2d 1 (1982). Had Conner confessed during the police officers' questioning, I would be inclined to reverse due to the threats and the misleading promises. *See McDougald v. State*, 295 Ark. 276, 748 S.W.2d 340 (1988). But because I do not believe that Conners's will was overborne in light of the passage of time between the threats and promise on the one hand and the confession on the other as well as Conner's conversation with his co-defendant, I concur in the affirmance.

DAVID NEWBERN, Justice, dissenting. Corey Jermo Conner, a tenth grader at Turrell Alternative School, turned seventeen on

July 19, 1996. On that day, he turned himself in to the police station in West Memphis because the police had come to his home, when he was not there, to question him in connection with a homicide. In the initial questioning, Mr. Conner denied having had a weapon at the scene of the crime.

The questioning began with details about those present at the scene of the crime, where Mr. Conner freely admitted having been. He was asked about his friends who were present, where they lived, and what they had done on the previous day. At one point, Mr. Conner mentioned that his cousin Maleka was at his home when the police had been there to question him. The officers asked him the last name of his cousin and then ridiculed him for not knowing it. Thereafter, the questioning included the following:

> BURCH: Do you know the charges you're faced?
>
> CONNER: Yes, sir.
>
> BURCH: Capital Murder, do you know what will happen if you are proven guilty for Capital Murder?
>
> CONNER: Yes, sir.
>
> BURCH: They strap you to a table and stick a needle in your arm and you go to sleep and you never wake up, that's what happens, and I don't believe a damn thing you've said since you started opening your mouth, you follow me? And I will tell you why. Because I was here until 10:00 o'clock last night talking to people, and eyewitnesses to all of this that went on, that had nothing to do with it, you follow me?
>
> CONNER: Yes, sir.
>
> BURCH: They didn't have nothing to do with this.
>
> CONNER: I didn't have anything to do with it either, and that's the truth, I am telling you all, and you all can believe me or not, I am telling you all the truth.
>
> BURCH: Now, we can do this two ways. Eddie and I can be your best friend you have, you follow me?

CONNER:   Yes, sir.

BURCH:   We can save your life, we can save your life. We can be responsible for strapping you on a table, it's up to you. Now if you want to get a little smart between your ears, and start telling us the truth, as you see it, then Eddie and I can work with you and maybe save your life. I am not promising you, but we can work with you and I am a man of my word and I won't break it, you follow me?

CONNER:   Yes, sir.

BURCH:   But you are sitting there and play me for a fool, and trying to play Mr. West for a fool, and we ain't buying it son, we are just not gonna do it. I can be the most meanest son of a bitch, that you ever walked across, and I don't believe what you are saying.

CONNER:   Well, I am telling you all the truth, I am telling you all the truth. That's what happened.

BURCH:   I am going to walk out of here and when I come back, we are going to start all over again, do you follow me?

CONNER:   Yes, sir.

BURCH:   And what you tell me, is what's going to direct your future, for the rest of your life, however short it may be.

WEST:   Corey, what the deal is, ain't nothing you've told us yet, went on, what for, about what other people have told us.

CONNER:   Mr. West, I am telling you the truth, this is the honest to God truth. I, me and my friends did not kill nobody. I am telling you the truth, that's the honest to God truth. That's what happened. That's what happened.

WEST:   I don't understand what you, I understand that you don't want to be charged with Capital Murder and I understand that you're telling me that you ain't done nothing, but it's more that happened than what you are telling me.

CONNER:   Well, whoever shot him, I don't know. I know that me and my friends didn't do it.

WEST:   Okay. Shawn Gilliam live on, live where?

CONNER: Over there by Maddox School, Burns Street, don't know the address.

WEST: Where does Andre McDaniel live, what is his address that he live at?

CONNER: Down on Mimosa.

WEST: What about Colin Ingram?

CONNER: He stay next door to me.

WEST: Okay.

CONNER: 231 West Jefferson.

WEST: So if I go and talk to these guys, these guys are going to tell me the same thing that you just told me?

CONNER: Yes, sir.

WEST: Uh —.

CONNER: Yes, sir.

WEST: You're sure.

CONNER: Yes, sir.

BURCH: One of them are going to accept a deal, one of them is going to plea, do you follow me?

CONNER: Yes, sir.

BURCH: The rest of you is going down, one of you is going try to (inaudible).

CONNER: Well, I —.

WEST: It's called plea bargaining.

CONNER: I understand that, but I am telling you all the truth.

WEST: Somebody is going to tell on the other.

CONNER: Well, I am telling you all the truth.

WEST: I want to believe you Corey, but it's hard to believe you when you get four or five people that telling something

totally different from what you're saying. Ain't nothing you have told us yet corresponding to that these other people said, nothing, noting, you sitting up in here like an angel.

BURCH: You're totally innocent.

WEST: Yeah.

BURCH: You didn't do nothing.

CONNER: I didn't.

BURCH: You're an innocent bystander.

CONNER: I didn't, I am an innocent bystander that was on a bike.

BURCH: May I tell you something right now. Picture yourself in court, picture 12 people sitting over there that really don't want to be there, they are really pissed off, do you follow me?

CONNER: Yeah.

BURCH: We put on five witnesses, five, that state, now these five witnesses that are not members of the group, they don't know the other people, they just happen to be in the area, do you follow me?

CONNER: Yes, sir.

BURCH: But everyone of them know you personally, they went to school with you, they know where you live, everyone one of them says, we seen him with a gun, shooting, everyone of them. You get your chance, you sit up there on the stand and you're doing just like you're doing right now, with your big dull eyes, and saying, I am an innocent bystander, I didn't do nothing. Now these 12 people sitting out there, what are they going to think. You tell me, what are they going to do, they are going to convict your ass, and send you away. I am telling you right now between the three of us, we will work around a lot of things and probably will end up and save your ass, do you follow me?

CONNER: Yes, sir.

BURCH: If you come through and tell us the scoop, drop your damn loyalty and anything else that you have to the streets out there, because of your five, what is it?

CONNER: Four.

BURCH: Four. One of them is gonna to cry and save his ass, you're lucky, you are the first one to get the opportunity, do you follow me?

CONNER: Yes, sir.

BURCH: The others, are going to burn, bubba, they are going to burn in hell, they are going to be strapped to a damn table, a damn needle in their arm, and they are going to be gone, your chance, I am going to offer it to you, you blow it, you ain't getting another one, because I got a whole lot to do today, and I am not going to set up here and plea with you to save your life, do you follow me?

CONNER: Yes, sir.

BURCH: It's your life, and quite personally, I don't care. One of you four is going to live, the other three will go down, I will guarantee you that, do you follow me?

CONNER: Yes, sir.

BURCH: Now we are talking the same language.

CONNER: Yes, sir.

BURCH: Last chance, no more. Now, Eddie, I am a son of a bitch, do you follow me? I will give you a chance, now I'll bust my ass to help you if you try to help yourself. You don't, I'll burn your ass in a heartbeat, that's the way I am, that's the way I work.

WEST: Well, what he is saying, is that we are not going to waste any more time, all right. Do you want to retract your story and tell us what happened, uh, we are going to close the interview out.

BURCH: We will start it all over again. It'll be like it never happened, and we will start everything over and you'll tell us the truth, do you follow me? If you tell us the truth.

WEST: We know what you're telling us now didn't happen that way.

CONNER: I am telling —.

BURCH: You think about it before you open your mouth, because I am ready to wrap this shit up now. Think about it. Before you open your mouth, think about what's going to happen within the next year. The end of next year, think about where you are going to be and what's going to be going on. Before you open your mouth, think about it. Now, we are going to start from the beginning, all the way from the beginning. If I get up and walk out of here, your days are gone man because I am not believing you, do you follow me?

CONNER: Yes, sir.

BURCH: And as far as I am concerned, you're a damn murderer. You deserve to be strapped to a table and stick a needle up your arm. If this new Huckabee have his way, your new governor, he's going to reinstate the electric chair, he ain't going this way no more. That's one of Huckabee's promises for law and order. I want to hear the truth. Start from the time that you get on Winchell Street and what took place, because I want to know, I want to hear it from your mouth.

We presume custodial statements to be involuntary, and the burden is on the State to show voluntariness. *Johnson v. State,* 307 Ark. 525, 528, 823 S.W.2d 440, 441 (1992). Among the factors to be considered are the age, education and intelligence of the accused; the length of the detention during which the statement was given; the use of repeated or prolonged questioning; the use of mental or physical punishment or coercion; and the advice or lack of advice of an accused's constitutional rights. *Shaw v. State,* 299 Ark. 474, 478, 773 S.W.2d 827, 829 (1989).

The majority opinion suggests that the State waived the death penalty in this case and thus "honored" the promise made by the police officers to save Mr. Conner's life. I am unaware of any indication in the record that there was any connection between the promise made and the waiver of the death penalty.

Through its totality-of-the-circumstances analysis, the majority approves the use of Mr. Conner's subsequent inculpatory statement and, in effect, condones this conduct on the part of the police officers, although "greatly troubled" by it. Mr. Conner was ridiculed, lied to, threatened, intimidated, and promised a reward that the officers were powerless to deliver. The majority concludes that was overbalanced by the fact that this seventeen-year-old tenth grader (1) was physically larger than the two interrogating officers, (2) sounded calm, (3) had several hours to contemplate the threats that had been made to him, and (4) spoke with one of his friends. My conclusion is to the contrary.

I respectfully dissent.

THORNTON, J., joins in this dissent.