Joshua BROWN *v.* STATE of Arkansas

CR 01-1196                                                117 S.W.3d 598

Supreme Court of Arkansas
Opinion delivered September 18, 2003

*Charles M. Duell*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Clayton K. Hodges*, Ass't Att'y Gen., for appellee.

Tᴏᴍ Gʟᴀᴢᴇ, Justice. Appellant Joshua Brown appeals from his convictions for first-degree murder and rape. Brown's sole point for reversal is that the trial court erred in denying his motion to suppress two custodial statements he gave to police shortly after the murder.

Because Brown does not challenge the sufficiency of the evidence on appeal, only a brief recitation of the facts is necessary. At about 4:50 a.m. on the morning of September 26, 1999, police responded to a 911 call from an apartment located at 1207 Sunset Drive in Rogers. Upon arriving, officers encountered a middle-aged man yelling, "He's not breathing, he's not breathing," and a second, younger man who was entirely naked and holding a flashlight and a telephone. An adolescent was found on the floor of the apartment's bedroom; the boy was naked and not breathing. Officers noted that the boy had some duct tape wrapped around one hand, and there were feces on his abdomen and genitals. An empty pill bottle was on the mattress next to the child. The boy, thirteen-year-old Jesse Dirkhising, was taken to St. Mary's Hospital in Rogers, where he was pronounced dead. The cause of death was later determined to be suffocation and positional asphyxia, with acute amitryptiline intoxication.

The two men in the apartment — thirty-eight-year-old Davis Don Carpenter and twenty-two-year-old Joshua Brown — were subsequently questioned by the Rogers police. Brown was arrested at the apartment for second-degree battery after he struck one of the investigating officers. After giving a number of statements to the police, Brown was charged with capital murder and six counts of rape. The rape charges were later reduced to one count, and Brown was convicted of rape and first-degree murder.[1] A jury sentenced him to twenty-five years on the rape conviction; after the jury deadlocked on a sentence for the murder conviction, the Benton County Circuit Court sentenced Brown to life imprisonment. As noted above, Brown's appeal challenges only the trial court's denial of his motion to suppress two of his statements, implicating both himself and Carpenter.

---

[1] At trial, Brown moved only for a directed verdict on the charge of capital murder, and did not move for a directed verdict on any lesser-included offense. See *Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003). During his opening statements, Brown conceded that the rape had occurred.

■ This court recently clarified the appropriate standard of review for cases involving a trial court's ruling on the voluntariness of a confession. Applying that standard, our court makes an independent determination based upon the totality of the circumstances. *Grillot, v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003); *Cox v. State*, 345 Ark. 391, 47 S.W.3d 244 (2001). Any conflict in the testimony of different witnesses is for the trial court to resolve. *Cox, supra.* In reviewing the trial court's ruling, we will reverse it only if it is clearly against the preponderance of the evidence. *Grillot, supra; Giles v. State*, 261 Ark. 413, 549 S.W.2d 479 (1977).

Brown's argument for reversal centers on two statements he gave to investigating officers Jared Mason and Hayes Minor. These two statements were the last of four statements Brown gave during the thirty-six hours following Jesse's death. Brown argues that the trial court erroneously ruled that these statements, given to officers Minor and Mason, were not the result of false promises of leniency.

■ This court has summarized our analysis of an allegedly false promise of leniency in both *Conner v. State*, 334 Ark. 457, 982 S.W.2d 655 (1998), and *Pyles v. State*, 329 Ark. 73, 947 S.W.2d 754 (1997). That analysis is as follows:

> If a police official makes a false promise which misleads a prisoner, and the prisoner gives a confession because of that false promise, then the confession has not been voluntarily, knowingly and intelligently made. In determining whether there has been a misleading promise of reward we look at the totality of the circumstances. The totality is subdivided into two main components[:] first, the statement of the officer and second, the vulnerability of the defendant. Because these two factors create such a multitude of variable facts, it has been impossible for us to draw bright lines of substantive distinction.

*Connor*, 334 Ark. at 469-70; *Pyles*, 329 Ark. at 77-78 (quoting *Davis v. State*, 275 Ark. 264, 630 S.W.2d 1(1982)).

■ ■ If, during the first step, this court decides that the officer's statements are unambiguous false promises of leniency, there is no need to proceed to the second step because the defendant's statement is clearly involuntary. *See Pyles, supra; Durham v. State*, 320 Ark. 689, 899 S.W.2d 470 (1995); *Hamm v. State*, 296 Ark. 385, 757 S.W.2d 932 (1988). If, however, the

officer's statement is ambiguous, making it difficult for us to determine if it was truly a false promise of leniency, we must proceed to the second step of examining the vulnerability of the defendant. *See Pyles, supra; Durham, supra; Hamm, supra.* Factors to be considered in determining vulnerability include: 1) the age, education, and intelligence of the accused; 2) how long it took to obtain the statement; 3) the defendant's experience, if any, with the criminal-justice system; and 4) the delay between the *Miranda* warnings and the confession. *Connor, supra; Free v. State,* 293 Ark. 65, 732 S.W.2d 452 (1987).

Brown argued below and in this appeal that the statements he gave to Minor and Mason were the result of the officers' false promise of leniency. Specifically, he points out Mason's testimony from the suppression hearing that Mason told Brown "that this was his chance to help himself." Although Brown's statement was tape-recorded, Mason made this statement to him prior to turning the tape recorder on. At the suppression hearing, Mason agreed that "help" could mean "benefit," but he asserted that he did not intend for his remarks to be construed by Brown "in a way of giving him hope of a benefit or giving him hope." Mason denied making Brown any promises or threatening him in any way, and he stated that he "did not convey to [Brown] how he was to help himself if he was to cooperate."

Brown also argues that Minor made false promises to him, and asserts that it was Minor's intent to make Brown believe that by continuing to give statements, he would be helping himself. Brown argues that, by using this tactic, Minor intentionally created in Brown the false hope that he would receive some benefit in exchange for his cooperation. Minor's testimony at the suppression hearing reflected that he "told [Brown] that this wasn't a deal-making process, that we really had no say in what would happen to him in the future." Minor also testified that he did not recall that he specifically advised Brown that he had an opportunity to help himself, but agreed that it was "not something I wouldn't say." Minor said that he told Brown that he "need[ed] all the help you can get right now," but Minor averred that he "made no specifics on how [Brown] could help himself out." Minor also testified he told Brown that he could not "make . . . any promises what is going to happen yet." The trial court denied Brown's motion to suppress.

As noted above, in reviewing a trial court's denial of a motion to suppress, this court makes an independent determination based upon the totality of the circumstances. Considering all of the circumstances, and taking into account the factors this court must address, it is clear that the trial court did not err in denying Brown's motion to suppress his statements. The first step in this court's analysis is to examine the officer's statement and determine whether it was an ambiguous promise of leniency. *See Connor, supra*; *Pyles, supra*. Here, although the trial court initially expressed what it termed "serious doubts" about the officers' tactics, the court ultimately found that the officers' statements to the effect that Brown could "help himself" were ambiguous promises. This court's recent case of *Roberts v. State*, 352 Ark. 489, 102 S.W.3d 482 (2003), is quite similar and controls our analysis here. In *Roberts*, this court held that an officer's encouragement to the defendant to "get it off your chest, we'll help," "could mean anything from letting Roberts cleanse his guilty conscience, . . . to allowing him to speak to a clergyman . . . . It certainly was not specific enough to be viewed as a false promise to get Roberts a reduced charge or a lesser sentence if he confessed." *Roberts*, 352 Ark. at 500, 102 S.W.3d at 489-90.

In the instant case, Mason testified that, by telling Brown he had the opportunity to help himself, he meant that Brown had an opportunity to not be the only person charged with the crime.[2] Mason denied, however, that he was trying to give Brown any hope that there would be an exchange of leniency. Likewise, Minor testified that he told Brown that he needed all the help he could get, and that he "had an opportunity to help himself by giving [Minor] a statement," but denied that he made any specifics about what the word "help" meant. Clearly, these were, at best, ambiguous promises.

Because the statements were ambiguous, the court must then examine Brown's vulnerability. The factors to consider, as noted above, are 1) the age, education, and intelligence of the accused; 2) how long it took to obtain the statement; 3) the defendant's experience, if any, with the criminal-justice system;

---

[2] At this point in their investigation, the officers had found some handwritten documents at Brown and Carpenter's apartment that they believed were instructions from Carpenter to Brown about what to do to the victim; Mason testified that he was trying to get Brown to tell him what the papers were.

and 4) the delay between the *Miranda* warnings and the confession. Here, the trial court first pointed out that Brown's first two inculpatory statements were unquestionably proper, and the officers taking those statements had made Brown "as comfortable as he could be." The trial court also noted that, at the time he gave the latter two statements, Brown already knew that he was going to be charged with murder, that he had voluntarily gone to the hospital to give a DNA sample, and that he was much calmer at the time he gave the two challenged statements. Considering the context of the entire exchange leading up to Brown's third statement, the court found that Brown was not so vulnerable at that point in time that the suggestions that he would be helping himself overrode his free will and turned an otherwise voluntary statement into something that was involuntary. With respect to the fourth statement, the court highlighted the fact that Brown had been given the chance to sleep overnight, and that he had been aware for nearly twenty-four hours that he was under suspicion of murder. The trial court concluded that there was "no way" it could find that anything Brown had said was in response to or in reliance upon some sort of promise by the police to help him.

In *Roberts*, where the police told Roberts to "get it off his chest," this court affirmed the denial of a suppression motion where Roberts was thirty-one years old, had a high school education, and had held a job for the last six years. He was detained by the police for only about two hours, and there was no lengthy delay between the time he was given his *Miranda* warnings and when he gave his confession. Therefore, this court concluded, the evidence did not demonstrate that Roberts was so vulnerable that the officer's statements to him rendered the confession involuntary.

In the present case, at the time of the murder, Brown was twenty-two years old, and his forensic mental evaluation revealed that he had a full-scale IQ of 114; Dr. Michael Simon, who conducted the evaluation, indicated that this score meant Brown was "presently functioning in the high average range of intelligence." The first of Brown's two statements was given at 10:51 p.m. on the same day the murder took place, and the second occurred at 9:18 the following morning. With respect to Brown's experience with the criminal justice system, he had been arrested

at least three times before[3] and had been to jail briefly. Brown had been advised of his *Miranda* rights prior to each of his earlier statements, and both Detective Mason and Sergeant Minor reminded him of those rights just before the two statements in question. Based on these factors, we cannot say that Brown was so vulnerable that his statements were involuntary, and it is apparent that the trial court did not err in denying Brown's motion to suppress these statements.

The record in this case has been reviewed for other reversible error in accordance with Ark. Sup. Ct. R. 4-3(h), and none has been found.

Affirmed.

CORBIN and THORNTON, JJ., not participating.

---

[3] Brown had been arrested twice for possession of marijuana, once on a contempt citation for failure to report to his probation officer, and once for having an expired license plate.