N. MARK KLAPPENBACH, Judge
This case is before us for a second time after we initially ordered rebriefing. Williams v. State , 2017 Ark. App. 663, 2017 WL 6046939. Jordan Williams was convicted by a jury in the Hempstead County Circuit Court of two counts of aggravated robbery, one count of aggravated residential burglary, one count of first-degree battery, two counts of second-degree battery, one count of interference with emergency communication, and one count of theft of property. He received an aggregate sentence of fifty years' imprisonment. On appeal, Williams argues that the circuit court erred in denying his motion for directed verdict, denying his motion *45 to suppress, and denying his Batson challenge. We affirm.
Prior to trial, Williams filed a motion to suppress his confession made during a custodial interview. Detective Andrew Watson of the Hope Police Department testified at the suppression hearing that he informed Williams of his Miranda rights prior to the interview, and Williams initialed and signed the form indicating his understanding. The interview began around 10:50 a.m. Watson said that Williams was concerned about missing his college welding courses, and Williams initially said that he had no involvement in the incident and did not know the victims, Mary Stuckey and her adult son Jordan Stuckey. Watson asked Williams if he would participate in a voice-stress analysis to determine whether he was telling the truth and to clear his name, and Williams agreed to do it.
Detective Todd Lauterbach testified that he administered a computerized voice-stress-analysis examination, which he described as computer software that reads a person's voice for truth verification. Prior to administering the exam, Lauterbach again informed Williams of his Miranda rights, and Williams signed a waiver and agreement to submit to the voice-stress-analysis exam. Lauterbach testified that Williams gave deceptive answers to the questions "were you at Mary and Jordan Stuckey's house the night of the robbery?" and "did you rob Mary and Jordan Stuckey?"
After the exam, Lauterbach left the room for a few minutes and conferred with Watson before they both returned to question Williams. Williams ultimately told the detectives that he was contacted by a "homeboy" who told him that the victims were supposed to have around $6000 in cash and some marijuana. Williams said that his accomplice kicked in the door. He told the detectives that his job during the robbery was to take Mrs. Stuckey's phone and keep her from calling the police while his accomplice robbed Mrs. Stuckey's son. When Williams returned to the front of the house, his accomplice had the money and was trying to get drugs, and two or three shots were fired. Williams claimed that he had not known his accomplice had a gun. They then ran out of the house to a side street where a third accomplice was waiting in a black Nissan. A video recording of the interview was played for the court.
Williams argued that the fact that he was enrolled in a trade course indicated relative intellectual weakness. He claimed that the detectives improperly induced his confession by stating that he could go free after taking the voice-stress-analysis exam and by telling him it would be bad if the detective had to testify. He also argued that he should have been advised of his Miranda rights before being questioned after the voice-stress-analysis exam. The circuit court denied the motion to suppress upon finding that Williams waived his Miranda rights and confessed voluntarily.
At the jury trial, Mary Stuckey testified that she woke up on the night of September 3, 2015, to find a man standing over her. She said that he hit her on the head and face and grabbed her phone from the foot of the bed. Mary hit the intruder with a stick and ran out of her room. She was shot in the lower back as she ran out the front door. She then saw two men running away from her home. Jordan Stuckey testified that when he woke up that night he saw both intruders in the house, and one continued toward his mother's room. The other intruder demanded money from Jordan and pointed a gun at his head. Jordan said that he gave the intruder $900 and was then shot twice. He saw both intruders run away and get into a dark colored Maxima.
*46 Sergeant Daniel Oller testified that he responded to the Stuckeys' home at approximately 2:50 a.m. He was told that the intruders had left in a dark colored Nissan Maxima, and he determined that the intruders entered the home by kicking in the locked door. Detective Watson testified about his interview with Williams in which he initially denied involvement but later admitted it. Watson testified that Williams provided specific facts of the crimes that were consistent with the facts provided by the victims, including each intruder's actions, the fact that the door had been kicked in, when the shots were fired, and the type of vehicle they fled in. The video of Williams's police interview, excluding the voice-stress analysis, was played for the jury.
Whitney Hall testified on Williams's behalf that on the night of the incident she got off work around 2:15 a.m. and spoke on the phone with Williams during her drive home. She said that Williams was at her home when she arrived around 3:10 a.m. Williams testified that he gave a false confession because he felt like the detective was belittling him and he thought the detective would help get him into drug rehabilitation. He said that the details he provided the detectives were things that he had heard from "the streets" and from a friend who had spoken to Jordan Stuckey's brother.
We first address Williams's challenge to the sufficiency of the evidence to support his convictions. In considering a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State, considering only the evidence that supports the verdict. Gipson v. State , 2010 Ark. App. 820, 2010 WL 4982941. We affirm if the verdict is supported by substantial evidence. Id. Substantial evidence is evidence that is forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. Id. Williams first argues that the evidence was insufficient because his confession should have been suppressed, and without his confession, there was no evidence identifying him or placing him at the home at the time of the robbery. However, when reviewing the sufficiency of the evidence supporting a conviction, this court considers all of the evidence introduced at trial, whether correctly or erroneously admitted, and disregards any alleged trial errors. Tennant v. State , 2015 Ark. App. 81, 2015 WL 585358. Thus, this argument is without merit.
Williams also claims that the evidence was insufficient because the State failed to corroborate his confession. A confession of a defendant, unless made in open court, does not warrant a conviction unless accompanied with other proof that the offense was committed. Ark. Code Ann. § 16-89-111(d)(1) (Supp. 2017). This requirement for other proof, sometimes referred to as the corpus delicti rule, mandates proof only that the offense occurred and nothing more. Molpus v. State , 2015 Ark. App. 452, 469 S.W.3d 374. Under the corpus delicti rule, the State must prove (1) the existence of an injury or harm constituting a crime and (2) that the injury or harm was caused by someone's criminal activity. Id. It is not necessary to establish any further connection between the crime and the particular defendant. Id. Here, it is clear that the requirement for other proof was met by the evidence offered by the State, including evidence that the Stuckeys' door was kicked in, they were robbed, and they were shot. This evidence established that the offenses occurred, and combined with Williams's confession, constitutes substantial evidence to support his convictions.
Williams next argues that the circuit court erred in denying his motion to suppress *47 because several factors rendered his confession involuntary: improper inducements by the detectives, his relative intellectual weakness, and the failure to advise him of his Miranda rights a third time. Williams claims that the detectives induced his confession by promising him a phone call if he talked, promising to help him if he was honest, and telling him he could be released if he passed the voice-stress-analysis exam. He also claims that his confession was induced when the detectives badgered him about lying and told him bad things would happen if he did not tell the truth. We disagree and affirm the circuit court's decision.
After Williams was read his rights and agreed to talk to Detective Watson, Watson said in part that
I met you, before. I guess, a few months ago, if you remember that, or about a year ago. It may've even been longer than that. Uh, like I said, you were honest with me all during all that that went on. You know I was honest with you. Alright, you know how I work. I'll do anything I can to help you if I can and you're honest with me. Lie to me, I don't care what happens to you. Okay? You got a question, all you gotta do to ask me, and if I can help you, I'm gonna tell you I can, and if I can't I'm gonna be straight up with you....
Williams then said that he wanted to make a phone call, and Detective Watson said that "like I told you just a minute ago, when we get done talking, I'll make sure you get a phone call." Watson told Williams that he knew he was at the victims' home but was not the shooter. Williams denied any involvement, and Watson asked him if he would be willing to take a voice-stress test to clear his name. Watson told him that if he passed it, he would not hear from him anymore on this case. After the exam, the detectives told Williams that they knew he was lying, they had proof he was there, and he did not want the detectives to go to court to tell what happened.
A statement made while in custody is presumptively involuntary, and the burden is on the State to prove by a preponderance of the evidence that a custodial statement was given voluntarily and was knowingly and intelligently made. Boyd v. State , 2016 Ark. App. 407, 500 S.W.3d 772. In cases involving a ruling on the voluntariness of a confession, this court makes an independent determination based upon the totality of the circumstances. Id. Any conflict in the testimony of different witnesses is for the circuit court to resolve. Brown v. State , 354 Ark. 30, 117 S.W.3d 598 (2003). In reviewing the circuit court's ruling, we will reverse only if it is clearly against the preponderance of the evidence. Id.
If a police officer makes a false promise that misleads the person in custody, and the person in custody gives a confession because of that false promise, then the confession has not been voluntarily, knowingly, and intelligently made. Boyd , supra. In determining whether there has been a misleading promise of reward, we look at the totality of the circumstances and examine, first, the officer's statement and, second, the vulnerability of the defendant. Id. If the officer's statement is an unambiguous false promise of leniency, there is no need to proceed to the second step because the defendant's statement is clearly involuntary. Id. If, however, the officer's statement is ambiguous, making it difficult for us to determine if it was truly a false promise of leniency, we must proceed to the second step of examining the vulnerability of the defendant. Id. Factors to be considered in determining vulnerability include (1) the age, education, and intelligence of the accused; (2) how *48 long it took to obtain the statement; (3) the defendant's experience, if any, with the criminal justice system; and (4) the delay between the Miranda warnings and the confession. Id.
Our review of the interview does not reveal any unambiguous false promise of leniency that would render the confession clearly involuntary. Williams has made no showing that the detective made false promises when he said that Williams could make a phone call when they were done and that passing the voice-stress-analysis exam would clear his name. The offer of help is a closer issue. In Roberts v. State , 352 Ark. 489, 102 S.W.3d 482 (2003), the supreme court held that the officer's statement to "get it off your chest, we'll help" was ambiguous and not specific enough to be viewed as a false promise to get the defendant a reduced charge or a lesser sentence if he confessed. Likewise in Brown , supra , the supreme court held that an officer's statement to the defendant that "this was his chance to help himself" was, at best, an ambiguous promise. Similarly here, the detectives made vague references to help and the need for him to be honest. Therefore, we proceed to the second step and examine Williams's vulnerability.
Williams claims that his intellectual weakness was shown by the fact that he was enrolled in a trade course and had trouble understanding the directions for the voice-stress-analysis exam. Williams initially said that he could not purposely lie when instructed to by Detective Lauterbach for control questions during the voice-stress-analysis exam. As the State notes, Williams was twenty-six years old at the time of the interview. It is apparent that he had some experience with the criminal justice system as Watson stated in the interview that he had dealt with Williams before, Williams referenced that he had been arrested on warrants, and he had a prior conviction for breaking or entering.
Regarding the timing of his Miranda warnings and confession, Williams was initially advised of his Miranda rights at 10:50 a.m. before being questioned by Detective Watson. He signed the waiver and stated, "I'll cooperate with you if you cooperate with me." Detective Lauterbach informed Williams of his Miranda rights again before administering the voice-stress-analysis examination, although Williams tried to tell him that he did not have to. Williams signed a form waiving his rights and agreeing to submit to the exam at 11:26 a.m. The exam ended at 12:00 and both detectives returned to question Williams a few minutes later. The results of the exam were explained to Williams, and he confessed shortly thereafter. Thus, Williams began his confession less than one and a half hours after first being advised of his Miranda rights and less than one hour after being advised for the second time. Williams argues that the hour and a half delay rendered his confession involuntary and that he should have been advised of his rights a third time. The only case Williams cites, however, Summerville v. State , 253 Ark. 16, 484 S.W.2d 85 (1972), held that a three-hour delay did not render the confession involuntary. In Roberts , supra , the defendant was informed of his Miranda rights at 3:16 in the afternoon before taking a polygraph test. He was informed of the results of the polygraph around 5:00, and the officer began writing down his confession at 5:30. The supreme court held that this was not a lengthy delay.
Based on our review of the totality of the circumstances, we hold that Williams was not so vulnerable that the detectives' statements rendered the confession involuntary. Thus, the circuit court's denial of *49 the motion to suppress is not clearly against the preponderance of the evidence.
Lastly, Williams argues that the circuit court erred by allowing the State to exclude two potential black male jurors because of their race. He contends that he made a prima facie case of discrimination as required by Batson v. Kentucky , 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), based on the State's discriminatory questioning and striking of these two jurors, and the circuit court should have required the State to provide an explanation for the strikes. After the State struck a potential juror during voir dire, the following colloquy occurred:
DEFENSE : Judge, may I point out something?
THE COURT : Are you making a motion?
DEFENSE : Yes, Judge. The State has struck, now, two black people that we've brought up. So, that would be in violation of Batson.
THE COURT : Two of three, the Court notes.
STATE : Okay, and there is a black person that is seated on the jury.
The court then called the next potential juror to be questioned. As the State notes, Williams did not request that the court rule on whether a prima facie case of discrimination had been shown or do anything to further pursue the Batson challenge. Although Williams contends that the burden shifted to the State to produce a racially neutral explanation, the record reflects that the analysis did not move past the first step, which requires the opponent of the peremptory strike to present facts that show a prima facie case of purposeful discrimination. Stokes v. State , 359 Ark. 94, 194 S.W.3d 762 (2004). The supreme court has made it clear that it is up to an appellant to obtain a clear ruling on an issue in order to preserve that point for appeal. Rutledge v. State , 345 Ark. 243, 45 S.W.3d 825 (2001). Williams has failed to preserve a Batson challenge for appeal.
Affirmed.
Virden and Harrison, JJ., agree.