Rodney RUTLEDGE *v.* STATE of Arkansas

CR 00-1146                                   45 S.W.3d 825

Supreme Court of Arkansas
Opinion delivered June 14, 2001

*Darrell F. Brown & Associates*, by: *Alvin Schay*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Michael C. Angel*, Ass't Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. The appellant, Rodney Rutledge, appeals from a judgment of conviction for capital murder and a sentence of life without parole. He raises two points in his appeal: (1) the trial court erred in not granting his motion for directed verdict; and (2) the circuit court erred in denying his motion for declaration of a mistrial based on a material violation of the discovery rules as set out in our Rules of Criminal Procedure. Neither point has merit, and we affirm.

The pertinent facts of this case are garnered from the testimony of the victim's sister, Korey Leavy, Little Rock police officers, and other witnesses at trial. On September 1, 1998, Tammy Williamson, the mother of Rutledge's twin children, was at the home of her sister, Korey Leavy, in Little Rock. Rutledge had called Williamson earlier that day and went to Leavy's home later that morning. After arriving, Rutledge asked Williamson to come outside with him, but she declined and requested that he come into the house instead and sit down. At some point, he walked away from the doorway of Leavy's house, but later he returned, entered the house, and moved toward Williamson, who was seated in a chair. He hit Williamson on the left side of her head with the butt of a pistol. He then grabbed her by the hair, pulled her out of her chair, and dragged her to the kitchen. In the process, he pulled her shirt

off. Leavy attempted to pick her sister up off the floor by grabbing her around the waist but was unsuccessful. She also asked Rutledge "to let her [sister] up." He refused. Rutledge next pointed the .32 caliber pistol to Williamson's head and shot her. Leavy did not remember Rutledge being shot in his hand during the fracas. According to the State's chief medical examiner, Dr. William Quentin Sturner, the fatal gunshot wound was fired at contact or near-contact range.

After the shooting, Leavy ran to the back of her house and called the Little Rock Police Department. She continued to observe Rutledge through a window and saw him carry Williamson over his shoulder towards his car. Rutledge then placed the victim in the back seat and drove away. Little Rock police officers apprehended Rutledge as he was about to cross the I-30 bridge over the Arkansas River, and he was placed under arrest. He was taken to the University Hospital in Little Rock because of a wound to his left hand.

At trial, Rutledge, who was twenty-six years old at the time of the murder, stated that he and Williamson had grown up together. He admitted to having a criminal record and said that he had been drinking and experimenting with drugs since eleven or twelve years of age. He testified that he had been in prison in 1997 or 1998, and that due to his prior contact with Williamson, he believed that she would accept him again after prison, as she had in the past. He was released from prison on Friday, August 28, 1998, four days before the murder. Upon his release, Williamson told him that she had met somebody else. He admitted that he then sought out drugs and got high. In the process, he apparently burglarized a pharmacy, and Little Rock police officers began looking for him. He stated that he was "on drugs" constantly after his release from prison and had not slept. He said that on the day of the murder, his mother dropped him off at his grandmother's house so that his grandmother could take him to his parole officer. At that point, he stated that he wanted to see Williamson, and he called her. He then grabbed some pills and a pistol off the top of his grandmother's refrigerator, took the keys to her car, and drove to Leavy's house. He testified that while at Leavy's house, he hit Williamson with the pistol and the pistol went off, with a resulting gunshot wound to his left hand. He said he did not realize immediately that the bullet from his pistol had also hit Williamson.

The jury convicted Rutledge of capital murder, and he was sentenced to life in prison without parole.

## I. Sufficiency of the Evidence

■■ Rutledge argues that the circuit court erred in refusing to grant his motion for a directed verdict. This court will consider an appellant's insufficiency-of-the-evidence argument prior to considering other arguments. *See Mitchell v. State*, 323 Ark. 116, 913 S.W.2d 264 (1996). When the court conducts such a review, it does so using the following standard, as set out in *Williams v. State*, 331 Ark. 263, 962 S.W.2d 329 (1998):

> Motions for directed verdict are treated as challenges to the sufficiency of the evidence. *Johnson v. State*, 326 Ark. 3, 929 S.W.2d 707 (1996); *Penn v. State*, 319 Ark. 739, 894 S.W.2d 597 (1995). When a defendant challenges the sufficiency of the evidence convicting him, the evidence is viewed in the light most favorable to the state. *Dixon v. State*, 310 Ark. 460, 470, 839 S.W.2d 173 (1992). Evidence is sufficient to support a conviction if the trier of fact can reach a conclusion without having to resort to speculation or conjecture. *Id*. Substantial evidence is that which is forceful enough to compel reasonable minds to reach a conclusion one way or the other. *Id*. Only evidence supporting the verdict will be considered. *Moore v. State*, 315 Ark. 131, 864 S.W.2d 863 (1993).

*Williams*, 331 Ark. at 265, 962 S.W.2d at 330 (quoting *McGehee v. State*, 328 Ark. 404, 410, 943 S.W.2d 585, 588 (1997)). Premeditation and deliberation may be inferred from the type and character of the weapon used, the manner in which the weapon was used, the nature, extent, and location of the wounds inflicted, and the conduct of the accused. *See Chase v. State*, 334 Ark. 274, 973 S.W.2d 791 (1998).

In this case, Rutledge called the victim from his grandmother's house, took a .32 caliber revolver from the top of her refrigerator, and drove his grandmother's car to the home of the victim's sister where the victim was visiting. He talked to Williamson from the doorway and then walked away when she refused to come outside. He was frustrated by this and later returned with a pistol which he used to hit Williamson on the left side of her head. Following that, he dragged Williamson from her chair by her hair into the kitchen and told her to "get [her] motherfucking ass up." He then shot her at very close range in the right side of her head with the pistol. As already indicated, Dr. Sterner testified that due to the grayish black sooty material around the wound, the barrel of the gun was

"extremely close, if not touching, the hair or scalp area" of Williamson, when the gun was fired. After shooting her, he carried the victim over his shoulder to his grandmother's car and drove away with her body in the back seat. He failed to stop immediately when a Little Rock police officer flashed his car's blue lights and turned on his siren, and only came to a stop when he was forced to do so by another vehicle at the I-30 bridge.

■ We conclude that from these circumstances, premeditation and deliberation can be inferred when viewing the evidence in the light most favorable to the State, as we are required to do. We further conclude that substantial evidence supports Rutledge's conviction. Accordingly, the circuit court did not err in denying his motion for a directed verdict.

## II. Discovery Violation

Rutledge next contends that the prosecutor failed to honor his motion for discovery and, thus, he was entitled to a mistrial. More particularly, he claims that the prosecutor failed to turn over to him his medical records from the University Hospital which showed the bullet wound to his left hand. This information, according to Rutledge, would have bolstered his claim that the shooting was accidental since the fatal bullet to Williamson also struck his hand. In short, Rutledge raises a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and Ark. R. Crim. P. 17.1(d), in that the prosecutor did not make available to Rutledge exculpatory evidence. The State responds that Rutledge had access to his own medical records and, thus, no prejudice to Rutledge resulted. The State cites this court to *Esmeyer v. State*, 325 Ark. 491, 930 S.W.2d 302 (1996), in support of its position.

We decide this matter on a procedural point. The State urges that Rutledge failed to preserve this point on appeal because he did not obtain a ruling from the circuit court on his mistrial motion. We agree. Following the empanelment of the jury on the first day of the trial, Rutledge moved the circuit court to order the release of his medical records. This was done. The medical records were obtained by fax toward the end of the trial and introduced into evidence. Rutledge, however, maintains that he was prejudiced in his defense because the records were not released to him earlier and that this was a critical violation by the prosecutor because the medical records supported his claim of an accidental shooting.

■ This court has made it clear in the past that it is up to an appellant to obtain a clear ruling on an issue in order to preserve that point for appeal. *See, e.g., Enos v. State,* 313 Ark. 683, 858 S.W.2d 72 (1993); *Hamm v. State,* 301 Ark. 154, 782 S.W.2d 577 (1990). In the case at bar, however, defense counsel made the following statement with regard to his mistrial motion:

> DEFENSE COUNSEL: Your Honor, I would suggest that they have not complied with our motion for discovery. They have violated *Brady.* And, under the circumstances, I feel obligated on behalf of my client to at this time move for a mistrial.

Defense counsel followed this motion by arguing several other points to the circuit court to which the State responded. The response from the circuit court was this:

> DEFENSE COUNSEL: We would also ask, your Honor, that the officer who is identified as transporting [Rutledge] be made available for cross-examination. And that's one of the reasons I raised the *Brady* question. If I had had [the medical records] when that particular officer was testifying, it is my opinion that I probably would have been able to get more information which is contained within the contents of particular [*sic*] document.

> THE COURT: Well, I don't think that that would be necessary. If the document comes in, then the *Brady* issue is moot.

> DEFENSE COUNSEL: Probably so.

Later, this discussion transpired:

> THE COURT: Well, the Court's just going to let the [medical record] in. And I think that will take care of most arguments.

> DEFENSE COUNSEL: Thank you, your Honor.

■ Thus, apart from the fact that Rutledge's medical records were always available to him before the trial, it appears that not only did he fail to obtain a ruling on this issue, but his counsel acquiesced in the circuit court's conclusion that the issue would be moot after the admission of the medical records into evidence. Certainly, Rutledge did not urge the court to rule on his mistrial motion following the court's comments on mootness. On the contrary, he seems to have agreed that the matter was moot. This issue is not preserved for our review.

The record in this case has been reviewed for reversible error pursuant to Ark. Sup. Ct. R. 4-3(h), and none has been found.

Affirmed.