Karl Douglas ROBERTS *v.* STATE of Arkansas

CR 02-22 102 S.W.3d 482

Supreme Court of Arkansas
Opinion delivered April 10, 2003

*Buckley & McLemore, P.A.,* by: *Tim Buckley,* for appellant.

*Mike Beebe,* Att'y Gen., by: *Jeffrey A. Weber,* Ass't Att'y Gen., for appellee.

D ONALD L. CORBIN, Justice. Karl Douglas Roberts was convicted in the Polk County Circuit Court of the cap-

ital murder of twelve-year-old Andria Brewer, for which he was sentenced to death by lethal injection. Roberts filed a waiver of his rights to appeal and to pursue postconviction remedies. Following a hearing on the waiver, the trial court determined that Roberts had the capacity to knowingly and intelligently waive his appeal rights. This is an automatic review of the entire record pursuant to our holding in *State v. Robbins*, 339 Ark. 379, 5 S.W.3d 51 (1999).[1] We find no error and affirm both the conviction and sentence.

The record reflects that on May 15, 1999, Andria Brewer was reported missing from her home, near Mena. She was last seen leaving her house in a small red pickup truck. Police initially thought that Andria may have run away from home. After a day or so, however, they decided that was unlikely, and they called in the FBI and the Arkansas State Police to help investigate. They first looked for people known to the family that drove small red pickup trucks. The only two people who fit that description were Roberts and Bobby Stone. Both men agreed to voluntarily go to the police station to be interviewed on May 17, and both submitted to polygraph examinations.

Roberts's polygraph exam was conducted by Corporal Ocie Rateliff of the Arkansas State Police. Rateliff read Roberts his *Miranda* rights prior to the exam and explained to him how the polygraph test worked. At the conclusion of the exam, Rateliff allowed Roberts to go outside to smoke a cigarette while he analyzed the polygraph. Before speaking with Roberts, Rateliff informed FBI Special Agent Mark Jessie that Roberts was being deceptive on the exam.

Rateliff then called Roberts back into the interview room and told him that the test revealed that he was being deceptive. Roberts immediately dropped his head and said, "I messed up." He then confessed that he took Andria from her home, drove her out on an old logging road, raped her, and then strangled her to

---

[1] On July 9, 2001, this court adopted an amendment to Ark. R. App. P.—Crim. 10 that effectively codified the mandatory review in death cases provided in *Robbins*, 339 Ark. 379, 5 S.W.3d 51. That amendment became effective for all cases in which the death penalty is imposed on or after August 1, 2001. Roberts's death sentence was imposed on May 23, 2000, prior to the effective date of the amendment. We thus review this case under *Robbins*.

death. Rateliff wrote down Roberts's statements as he made them, and then Roberts signed off on the written statement.

Roberts was subsequently convicted of the capital murder of the young girl and sentenced to death, in an order entered on May 23, 2000. Following his conviction and sentence, on June 13, 2000, Roberts filed a waiver of appeal. Thereafter, the trial court held a hearing on the waiver and determined that Roberts had knowingly and intelligently waived his appeal rights. This court granted the State's petition for a writ of certiorari to review the record in this case and appointed attorney Tim Buckley to abstract the record and prepare a brief setting out any points of error. *See Roberts v. State*, CR 02-22, slip op. (February 7, 2002) (*per curiam*).

■ Because Roberts waived his rights to appeal and to postconviction relief, this court must conduct a review of the record in this case to determine whether there is reversible error. In doing so, we must consider and determine: (1) whether Roberts properly waived his rights to appeal; (2) whether any errors raised in the trial court are prejudicial to Roberts in accordance with Ark. Code Ann. § 16-91-113(a) (1987) and Ark. Sup. Ct. R. 4-3(h); (3) whether any plain errors covered by the exceptions provided in *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980), have occurred; and (4) whether other fundamental safeguards were followed. *See Smith v. State*, 343 Ark. 552, 39 S.W.3d 739 (2001); *Robbins*, 339 Ark. 379, 5 S.W.3d 51.

Appointed counsel raises four points of error. The first two points concern the trial court's refusal to suppress Roberts's statement and the physical evidence gained as a result thereof. The third point concerns the seating of a juror that the defense attempted to remove for cause. The fourth point challenges the evidence to support the aggravating circumstance that the crime was committed in an especially cruel or depraved manner. Before reviewing these points or any other potential errors, we must first determine whether the trial court erred in ruling that Roberts was competent to waive his appeal rights.

*I. Knowing and Intelligent Waiver of Appeal Rights*

■ In this state, a defendant sentenced to death will be able to forego a state appeal only if he or she has been judicially determined to have the capacity to understand the choice between life

and death and to knowingly and intelligently waive any and all rights to appeal his or her sentence. *Smith*, 343 Ark. 552, 39 S.W.3d 739. This court will not reverse the trial court's conclusion unless it is clearly erroneous. *Id.*

In the present case, the trial judge had the benefit of having heard much psychological evidence during the pretrial competency hearing and throughout the course of the trial. The defense presented testimony from Dr. Lee Archer, a neurologist from the University of Arkansas Medical Sciences, and Dr. Mary Wetherby, a neuropsychologist from Texarkana. Both doctors testified that Roberts had experienced an injury to the frontal lobes of his brain when he was hit by a dump truck at age twelve. Both doctors stated that as a result of the brain injury, Roberts suffered from hallucinations and his ability to conform his conduct to the requirements of the law was impaired. Both doctors acknowledged that Roberts knew right from wrong, but they opined that he was not able to control his emotions, and that this lack of emotional control was directly responsible for his raping and murdering the victim.

The State presented testimony from Dr. Reginald Rutherford, a clinical neurologist, and Dr. Charles Mallory, a psychologist from the Arkansas State Hospital. Dr. Rutherford opined that Roberts's brain injury did not cause him to do what he did. Rutherford explained that Roberts had no dramatic behavioral problems that would indicate that he would do something of this nature. Rutherford also stated that it was evident that Roberts was involved in a complex series of actions that culminated in the crime, and that his actions demonstrated that he appreciated the criminality of his conduct.

Mallory determined that Roberts had a full-scale I.Q. of seventy-six, which placed him within the borderline-intellectual-functioning range. Despite his lower I.Q., Mallory found that Roberts had graduated high school, could read and write on a high school level, had held the same job for the last six years, and had a wife of ten years and a family. Mallory also stated that Roberts did very well on the Georgia Court Competency Test, which measures if a person understands the criminal-justice system and the procedure of the trial. Mallory stated that Roberts's responses demonstrated that he understood his legal rights and the trial process. Mallory ultimately concluded that, based on his tests and interviews with Roberts and his review of Roberts's medical and psychological records,

Roberts knew the difference between right and wrong and that he had the ability to conform his conduct to the requirements of the law. Mallory relied on the foregoing facts as well as on Roberts's actions in the crime. Particularly, Mallory stated that Roberts was cognitive of his actions, and that he took steps to avoid apprehension both before and after the crime, by driving the girl to a remote location, raping and killing her, and then covering up her body and throwing away her clothes. Mallory also pointed to Roberts's statement that he decided to kill Andria because he knew that she could identify him as having raped her.

During the posttrial hearing, defense counsel asked Roberts if he was aware of the rights that he was waiving, specifically his right to appeal to this court, his right of postconviction challenge under Ark. R. Crim. P. 37.5, and his postconviction and *habeas* rights in federal court. Roberts stated that he understood the rights he was waiving and that it was his desire to waive any right to appeal. Roberts stated that he was not under the influence of alcohol or any other substance that would affect his ability to understand or to make a decision.

The trial judge asked Roberts a series of questions about the rights he was waiving and, specifically, if he understood what it meant to waive a right. Roberts stated that the word waiver "means to let something pass." Roberts then reaffirmed that he understood all of his appeal rights. The trial judge asked Roberts to tell him in his own words what he was asking for, and Roberts stated: "I want to die." The trial judge then asked Roberts if he was asking that the death sentence be carried out without any further action by his attorney on direct appeal, and Roberts stated: "Yes."

■ We conclude that the foregoing evidence demonstrates that the trial court did not clearly err in determining that Roberts knowingly and intelligently waived his rights of appeal. We now turn to the points raised by appointed counsel in his brief.

## II. Errors Alleged by Appointed Counsel

### A. Motion to Suppress Statement and Physical Evidence

Appointed counsel first argues that the trial court erred in denying Roberts's motion to suppress his statement to police and any physical evidence gathered afterwards, as fruit of the poisonous tree. During the proceedings below, Roberts's attorneys argued

that the statement was involuntary because the police made a false statement of leniency in order to secure Roberts's confession. At the suppression hearing, Officer Rateliff testified that when he confronted Roberts with his deceptive polygraph exam, Roberts "got that teared up look in his eye and dropped his head and said, 'I messed up last Saturday.'" Rateliff testified that Roberts also said that he needed help. Rateliff stated that he then rolled his chair over next to Roberts, put his hand on Roberts's shoulder and stated: "Get it off your chest, we'll help." When questioned by the defense, Rateliff explained that the help he was referring to was listening to Roberts and letting him get it "out in the open."

Agent Jessie testified that both he and Rateliff were present in the interview room when Roberts came back in, and that when Rateliff told him that the polygraph indicated that he was being deceptive, Roberts "teared up and began to cry and made a statement to the effect that he had done something terrible." Jessie also stated that Roberts asked for help. Jessie explained that, based on the general tone of the statement, he thought that the help Roberts was referring to was from a clergyman.

Defense counsel argued that by stating "we'll help," the officers made a false promise of leniency to induce Roberts's confession. The prosecutor responded that the statement was too vague to be a promise of leniency. The prosecutor argued that at the point that Rateliff made the statement, the officers did not even know what they were dealing with, *i.e.*, whether Andria had been kidnapped or whether she was dead. The prosecutor argued that it would be hard to make a promise of leniency if the officers did not know what they were promising. The prosecutor conceded, however, that all the physical evidence they gained was the result of Roberts's statement and that, therefore, if the statement were suppressed, the physical evidence would have to be suppressed as well.

The trial court denied the motion to suppress, finding that the statement by Rateliff amounted to nothing more than an officer being courteous. The trial court found further that Roberts was over the age of twenty-one, that he could read and write, and that he was capable of functioning in society, as demonstrated by the facts that he was married and had a family, a home, and a job. The trial court noted the testimony of Dr. Mallory that although Roberts's intelligence was not overly great, he could

function in society and was capable of understanding. The trial court also found that Roberts was not initially detained by the police, but that he came to the police voluntarily. The trial court found further that the actual period of detention, *i.e.*, from the point that Roberts stated that he had messed up and was thus no longer free to leave, was not lengthy. Based on all of these circumstances, the trial court concluded that the statement was not involuntary. We find no error on this point.

■ ■ A statement induced by a false promise of reward or leniency is not a voluntary statement. *Bisbee v. State*, 341 Ark. 508, 17 S.W.3d 477 (2000). When a police officer makes a false promise that misleads a prisoner, and the prisoner gives a confession because of that false promise, then the confession has not been made voluntarily, knowingly, and intelligently. *See Conner v. State*, 334 Ark. 457, 982 S.W.2d 655 (1998); *Pyles v. State*, 329 Ark. 73, 947 S.W.2d 754 (1997). In deciding whether there has been a misleading promise of reward or leniency, this court views the totality of the circumstances and examines, first, the officer's statement and, second, the vulnerability of the defendant. *Id.*

■ ■ If we determine in the first step that the officer's statement is an unambiguous false promise of leniency, there is no need to proceed to the second step. *Id.* If, however, the officer's statement is ambiguous, making it difficult for us to determine if it was truly a false promise of leniency, we must proceed to the second step of examining the vulnerability of the defendant. *Id.* Factors to be considered in determining vulnerability include: (1) the age, education, and intelligence of the accused; (2) how long it took to obtain the statement; (3) the defendant's experience, if any, with the criminal-justice system; and (4) the delay between the *Miranda* warnings and the confession. *Conner*, 334 Ark. 457, 982 S.W.2d 655 (citing *Hamm v. State*, 296 Ark. 385, 757 S.W.2d 932 (1988); *Free v. State*, 293 Ark. 65, 732 S.W.2d 452 (1987)).

■ ■ Additionally, for the statement to be involuntary, the promise must have induced or influenced the confession. *Bisbee*, 341 Ark. 508, 17 S.W.3d 477. Furthermore, the defendant must show that the confession was untrue, because the object of the rule is not to exclude a confession of truth, but to avoid the possibility of a confession of guilt from one who is, in fact, innocent. *Id.* We will not reverse the trial court's denial of a motion to suppress a statement unless it is clearly erroneous or clearly

against the preponderance of the evidence. *Conner*, 334 Ark. 457, 982 S.W.2d 655.

Here, the statement made by Officer Rateliff was, "Get it off your chest, we'll help." According to both Rateliff and Agent Jessie, the statement was made after Roberts had dropped his head and stated that he had messed up and that he needed help. The statement itself is ambiguous, especially given the context. The phrase "we'll help" could mean anything from letting Roberts cleanse his guilty conscience, as Rateliff testified, to allowing him to speak to a clergyman, as Jessie testified. It certainly was not specific enough to be viewed as a false promise to get Roberts a reduced charge or a lesser sentence if he confessed. The prosecutor's point is well taken, that at the time Rateliff made the statement, the officers did not know what Roberts was about to tell them or whether the girl was dead or alive. Because the statement is ambiguous, we proceed to the second step and assess Roberts's vulnerability.

The evidence showed that Roberts was thirty-one years old at the time and that he had graduated high school and had held a job for the last six years. The evidence also showed that Roberts had been married for ten years and that he had two children. Dr. Mallory testified that Roberts's overall I.Q. was seventy-six, which placed him in the range of borderline intellectual functioning. Mallory indicated, however, that Roberts could read and write at a high school level, and that he reads like a person who has a higher I.Q. This court has held that a low score on an I.Q. test does not mean that a suspect is incapable of voluntarily making a confession or waiving his rights. *See, e.g., Diemer v. State*, 340 Ark. 223, 9 S.W.3d 490 (2000) (upholding confession of defendant who was twenty years old and had an I.Q. of seventy-seven); *Misskelley v. State*, 323 Ark. 449, 915 S.W.2d 702, *cert. denied*, 519 U.S. 898 (1996)(affirming the admission of a confession where the defendant was age seventeen, had an I.Q. of seventy-two, and was reading on a third-grade level); *Oliver v. State*, 322 Ark. 8, 907 S.W.2d 706 (1995) (affirming the admission of a confession where the defendant was fifteen years old, had an I.Q. of seventy-four, and read on a second-grade level). Accordingly, Roberts's I.Q. of seventy-six must be viewed in light of the facts that he was thirty-one years old, had graduated high school, and could read and write at a high school level.

Additionally, the record reflects that Officer Ratel iff informed Roberts of his *Miranda* rights from a statement-of-rights form at 3:16 in the afternoon, before Roberts took the polygraph test. Roberts stated that he understood his rights, and he agreed to talk to the officer. Ratel iff stated that the test took anywhere from forty-five minutes to an hour to complete. During this entire time, Roberts was not in custody and was free to leave. In fact, after completing the polygraph, Roberts went outside to smoke, while Ratel iff evaluated the test. Roberts was told the results of his polygraph around 5:00. Thereafter, he confessed. Ratel iff began writing Roberts's statement at 5:30. The statement was finally completed at 6:54. All told, Roberts was at the police station for approximately four hours, but he was only detained for a period of two hours. We agree with the trial court that this is not a lengthy period of detention. Moreover, there was not a lengthy delay between Roberts's confession and the time that he was informed of his *Miranda* rights.

As for Roberts's emotional vulnerability, there was testimony from Officer Ratel iff that while Roberts was confessing, he was upset, crying, embarrassed, and mad at himself. Ratel iff also stated that Roberts appeared remorseful. Agent Jessie stated that Roberts broke down and sobbed during his confession; however, he stated that Roberts's emotion and remorse seemed to stem less from the fact that he had taken the young girl's life and more because he had ruined his own life.

Appointed counsel asserts that Roberts's emotional state combined with his lower intelligence and his limited experience with the criminal-justice system demonstrate that he was especially vulnerable to the officer's statement. Appointed counsel relies on the holding in *Pyles*, 329 Ark. 73, 947 S.W.2d 754. That case, however, is distinguishable. There, the interrogating officer assured Pyles that he knew that Pyles was not a cold-blooded killer, and that he would "help him in every way in the world." *Id.* at 77, 947 S.W.2d at 755. In suppressing the statement, this court found the following facts significant: (1) that the interrogating officer had previously known the defendant through baseball and had a friendly relationship with him; (2) that the defendant was interrogated for a long period of time; and (3) that the defendant was emotional during the interrogation, as demonstrated by the fact that he held the officer's hands and wept as he confessed. This court also noted

Pyles's testimony that the officers had repeatedly told him that if the murder was done in self-defense, a court would be more lenient. Additionally, the State conceded that the officer's promise in that case was questionable. This court held that the totality of the circumstances supported the conclusion that the confession was not voluntary. The same is not true here.

 In this case, the officer's statement, "Get it off your chest, we'll help," is ambiguous, at best, and the evidence does not demonstrate that this defendant was so vulnerable that the officer's statement rendered the confession involuntary. Moreover, even if the officer's statement could be considered to be a false promise of leniency, the confession was not invalid because the record does not demonstrate that the officer's statement induced or influenced Roberts's confession. This is evident from the fact that immediately after being informed that his answers on the polygraph exam were deceptive, Roberts hung his head and stated that he had messed up and that he needed help. Thus, Roberts had already incriminated himself before any alleged promise was made, and he appeared to be ready to confess to his crimes, regardless of Rateliff's statement. In contrast, the defendant in *Pyles* made no statement until after the police promised to help him.

 Finally, we cannot say that the defense has succeeded in showing that Roberts's confession was untrue or that it was a false confession of guilt of one who is, in fact, innocent. To the contrary, the veracity of his confession is demonstrated by the physical evidence obtained thereafter.

We cannot leave this point without responding to the concerns raised by the dissent, regarding the brain injury that Roberts sustained when he was struck by a dump truck at age twelve. The dissent opines that this injury combined with his low I.Q. and his adolescent behavior patterns made Roberts especially vulnerable to Rateliff's statement. While we agree that the evidence of the *physical* extent of Roberts's brain injury was uncontroverted, we point out that the *effect* of the injury on Roberts's behavior was highly controverted. As noted in the previous section, the defense experts stated that his brain injury resulted in Roberts being unable to control his emotions and actions. They also indicated that the injury resulted in Roberts's behaving more like an adolescent, than an adult. However, neither defense expert opined that Roberts lacked the ability to understand his legal rights or that he

lacked the capacity to appreciate the criminality of his actions. To the contrary, Dr. Wetherby stated that Roberts knew he was in trouble after he had raped Andria, and Dr. Archer specifically stated that Roberts could understand right from wrong.

Dr. Rutherford, one of the State's experts, testified that he agreed with Dr. Archer as to the extent of the physical injury to Roberts's frontal lobe.' He opined, however, that the relationship between the loss of tissue and brain function was less clear cut. He stated that from his review of the medical records and Roberts's reported history, he found no severe or dramatic behavioral problems that would indicate that his brain injury was the sole cause of his actions on the date in question. He further pointed out that the majority of the tissue loss to Roberts's brain was to the right frontal lobe, and that it was better to sustain an injury to that side of the brain, because loss on that side will result in less aberrant behavior. Finally, he stated that there are many reasons, besides a frontal-lobe injury, that a person may have behavioral problems, and that, in his opinion, Roberts's brain injury was not the cause of his criminal actions.

 Based on this conflicting evidence of the effect of Roberts's brain injury on his behavior and actions, we are hard pressed to conclude, as the dissent does, that Roberts's brain injury made him especially vulnerable to Officer Rateliff's ambiguous statement of help. Instead, we conclude that the totality of the evidence in this case demonstrates that the trial court did not clearly err in denying Roberts's motion to suppress his statement. Because there was no error in refusing to suppress the statement, there is likewise no error in refusing to suppress the physical evidence gained as a result of the statement. Where the tree is not poisonous, neither is the fruit. *Jones v. State*, 348 Ark. 619, 74 S.W.3d 663 (2002); *Criddle v. State*, 338 Ark. 744, 1 S.W.3d 436 (1999).

## B. Juror for Cause

Appointed counsel next argues that the trial court erred in refusing to strike for cause juror Glenda Gentry, who was seated on Roberts's jury. During jury selection, defense counsel objected to Mrs. Gentry on the ground that she had stated that she had been sexually abused by her father when she was eighteen years old. Although the exact date of the abuse is unknown, it appears to have

occurred many years earlier, given that Mrs. Gentry stated that she had children ages thirty, twenty-nine, and twenty-four. Mrs. Gentry indicated that her allegations had resulted in the prosecution of her father, but that he was ultimately acquitted of the crime.

When asked if she carried any resentment because of the incident or because of the failure of the criminal-justice system, Mrs. Gentry stated that her father was now dead, and that the matter was over and she could not change anything. When asked if she could be fair and impartial in this case, given that Roberts was charged with raping and killing a twelve-year-old girl while he was thirty-one years old, Mrs. Gentry stated that she could. She stated further that she could set aside anything that had happened to her personally and decide the case based on the facts and the law. When asked by the prosecutor if she could still be impartial in light of the fact that Roberts was the victim's uncle and there was a family relationship involved, she stated that she could. Mrs. Gentry then stated that the family relationship did not change any of the answers that she had given to defense counsel.

At the conclusion of the questioning, the prosecutor announced that the juror was acceptable to the State, but defense counsel asked to approach. At the bench, defense counsel informed the trial court that if they had any peremptory strikes left, they would use one on Mrs. Gentry. Counsel then stated: "It doesn't appear that her answers go to the level of moving for cause." However, defense counsel argued that had the trial court granted some of their prior motions to strike other jurors for cause, they would not have used up all of their peremptory strikes and would have been able to remove Mrs. Gentry from the jury.[2]

 Appointed counsel now asserts as a point of error that the trial court should have excused Mrs. Gentry for cause. However, this point was not preserved for appellate review, since defense counsel essentially agreed with the trial court's ruling, conceding that there were no grounds to excuse Mrs. Gentry for cause. This court has repeatedly stated that a defendant cannot

---

[2] After much discussion at the bench, the trial judge indicated that he would be inclined to reverse one of his prior rulings on a motion to strike for cause, so that the defense would receive an additional peremptory strike. In response, defense counsel stated that he was satisfied with the record as it was. However, the record reflects that sometime after Mrs. Gentry's selection, defense counsel exercised an additional peremptory challenge.

agree with a trial court's ruling and then attack the ruling on appeal. *See, e.g., Camargo v. State*, 346 Ark. 118, 55 S.W.3d 255 (2001); *Bell v. State*, 334 Ark. 285, 973 S.W.2d 806 (1998). Accordingly, there is no reversible error reviewable under Rule 4-3(h) or section 16-91-113(a).

Nor does this point fall within one of the four plain-error exceptions set out in *Wicks*, 270 Ark. 781, 606 S.W.2d 366. Those exceptions are: (1) a trial court's failure to bring to the jury's attention a matter essential to its consideration of the death penalty itself; (2) error by the trial judge of which the defense has no knowledge and therefore no opportunity to object; (3) a trial court's failure to intervene without objection and correct a serious error by admonition or declaring a mistrial; and (4) failure of the trial court to take notice of errors affecting substantial rights in a ruling admitting or excluding evidence, even though there is no objection. Only the third exception could possibly apply to this case; however, given our law on the presumption of impartiality of jurors, it cannot be said that the trial court's failure to strike Mrs. Gentry on its own motion amounted to a serious error or grounds for a mistrial.

 A juror is presumed to be unbiased and qualified to serve, and the burden is on the appellant to prove actual bias. *Spencer v. State*, 348 Ark. 230, 72 S.W.3d 461 (2002); *Smith*, 343 Ark. 552, 39 S.W.3d 739. The decision to excuse a juror for cause rests within the sound discretion of the trial court, and its decision will not be reversed absent an abuse of that discretion. *Id.* It is the appellant's burden to show that he or she was prejudiced by the juror being seated. *Id.* When a juror states that he or she can lay aside preconceived opinions and give the accused the benefit of all doubts to which he is entitled by law, a trial court may find the juror acceptable. *Spencer*, 348 Ark. 230, 72 S.W.3d 461; *Taylor v. State*, 334 Ark. 339, 974 S.W.2d 454 (1998). Although the bare statement of a prospective juror that he or she can give the accused a fair and impartial trial is subject to question, any uncertainties that might arise from the juror's response can be cured by rehabilitative questions. *Id.*

 The fact that Mrs. Gentry stated that she had been sexually abused by her father when she was an adolescent, in and of itself, is not sufficient evidence of bias to overcome the presumption of impartiality. Moreover, Mrs. Gentry's answers to

questions from defense counsel and the prosecutor demonstrate that she could lay aside any feelings she had about her abuse and decide Roberts's case on the merits. Accordingly, the trial court did not commit error, plain or otherwise, by declining to remove Mrs. Gentry for cause.

### C. Sufficiency of the Evidence to Support the Aggravating Circumstance

Appointed counsel's last point of error is that there is insufficient evidence to support the jury's finding that the one aggravating circumstance submitted by the State existed beyond a reasonable doubt. That aggravating circumstance was that the murder was committed in an especially cruel or depraved manner, as set out in Ark. Code Ann. § 5-4-604(8) (Supp. 2001), which provides in pertinent part:

> (B)(i) For purposes of this subdivision (8)(A) of this section, a capital murder is committed in an especially cruel manner when, as part of a course of conduct intended to inflict mental anguish, serious physical abuse, or torture upon the victim prior to the victim's death, mental anguish, serious physical abuse, or torture is inflicted.
>
> (ii)(a) "Mental anguish" is defined as the victim's uncertainty as to his ultimate fate.
>
> (b) "Serious physical abuse" is defined as physical abuse that creates a substantial risk of death or that causes protracted impairment of health, or loss or protracted impairment of the function of any bodily member or organ.
>
> (c) "Torture" is defined as the infliction of extreme physical pain for a prolonged period of time prior to the victim's death.

The State asserts that two of these elements were present in this case: (1) that Roberts intended to inflict mental anguish on the twelve-year-old victim by refusing to tell her what was going to happen to her, after she repeatedly inquired, and (2) that Roberts intended to and did inflict serious physical abuse on the girl when he violently raped her.

 Whenever there is evidence of an aggravating or mitigating circumstance, however slight, the matter should be submitted to the jury for consideration. *Jones v. State*, 340 Ark. 1, 8 S.W.3d 482 (2000) (citing *Willett v. State*, 335 Ark. 427, 983 S.W.2d 409 (1998); *Kemp v. State*, 324 Ark. 178, 919 S.W.2d 943,

*cert. denied*, 519 U.S. 982 (1996); *Dansby v. State*, 319 Ark. 506, 893 S.W.2d 331 (1995)). Once the jury has found that an aggravating circumstance exists beyond a reasonable doubt, this court may affirm only if the State has presented substantial evidence in support of each element therein. *Id.*; *Greene v. State*, 335 Ark. 1, 977 S.W.2d 192 (1998). Substantial evidence is that which is forceful enough to compel reasonable minds to reach a conclusion one way or the other and permits the trier of fact to reach a conclusion without having to resort to speculation or conjecture. *Id.* To make this determination, this court views the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. *Jones*, 340 Ark. 1, 8 S.W.3d 482.

Here, the evidence showed that Andria was taken from her home by Roberts on May 15, 1999. According to his confession, Roberts knocked on the door, and Andria answered. Roberts knew that her parents were not home at the time. He told Andria to get into his truck. Andria then asked him what was wrong, and Roberts responded by telling her to just get in the truck. Andria complied. Roberts then proceeded on a journey of approximately ten miles that, according to Arkansas State Police Detective Lynn Benedict, would have taken twelve to thirteen minutes. Benedict also stated that the road that Roberts took continued to become darker and more remote, covered with low hanging trees and brush.

According to Roberts's statement, Andria asked him to take her home several times along the way. Roberts kept on driving. He eventually stopped his truck on an old logging road and told Andria to get out. When she asked him what he was going to do, he told her he was going to "fuck" her. He told her to take off her shirt and lay down. He then took off the girl's pants and raped her. While he was violating her, Andria tried to get away from him, but he was able to hold her down. He told police that when he finished raping her, he knew that he could not let her live, because he had ejaculated inside her. He then decided to kill her by mashing his thumbs into her throat. Once the child turned blue and passed out, he dragged her body off into the woods and covered her up with limbs and brush. He then took her clothes and threw them off a nearby bridge, into a creek.

Associate Medical Examiner Dr. Stephen Erickson testified that the child's vaginal vault was bruised in three different areas and,

in his opinion, the area was subjected to a significant amount of trauma. Erickson further stated that the sexual encounter would have to have been pretty rough to cause such "deep-seated injuries."

The foregoing is substantial evidence that the murder was committed in an especially cruel or depraved manner. Roberts's intention to inflict mental anguish on the girl is evident from his own admission that when he took Andria from her home, he would not tell her what was going to happen to her and he ignored her repeated pleas to be taken home. Instead of taking her home, Roberts drove her down a long, dark, remote logging road, which took some twelve or thirteen minutes to travel. He then violently raped her, causing deep-seated injuries to the child's vagina. Accordingly, we find no error on this point.

### III. Review under Rule 4-3(h) and Section 16-91-113(a)

In addition to the issues briefed by appointed counsel, we have further reviewed the transcript of the record in this case for adverse rulings objected to by Roberts and his counsel, pursuant to Rule 4-3(h) and section 16-91-113(a), and no such reversible errors were found.

### IV. Review for Plain Error under Wicks

Arkansas does not recognize plain error, *i.e.*, an error not brought to the attention of the trial court by objection, but nonetheless affecting substantial rights of the defendant. *Smith*, 343 Ark. 552, 39 S.W.3d 739; *State v. Robbins*, 342 Ark. 262, 27 S.W.3d 419 (2000). We have, however, adopted four limited exceptions in *Wicks*, 270 Ark. 781, 606 S.W.2d 366, as set out above. In *Robbins*, this court mandated consideration of the *Wicks* exceptions in death-penalty cases where, as in the instant case, the defendant has waived his or her appeal rights. Our review of the transcript of the record in this case reveals no errors under the *Wicks* exceptions.

### V. Other Fundamental Safeguards

The final review requirement under *Robbins*, 339 Ark. 379, 5 S.W.3d 51, is to determine whether other fundamental safeguards were followed. This court did not define the term

"fundamental safeguards" in that case, nor do we attempt to do so here. Suffice it to say, nothing in the instant record reveals any irregularity in procedure that would call into question the essential fairness of the process afforded Roberts.

The dissent asserts that the jury in this case did not properly complete Form 2 of the sentencing instructions, which pertains to mitigating circumstances. The dissent contends that because sections B and C of that form were left blank, it cannot be determined whether the jury properly considered the mitigating evidence prior to imposing the death penalty. We note that neither trial counsel nor appointed counsel challenged the verdict forms. However, out of an abundance of caution, we will address the concern raised by the dissent.

The record reflects that the defense submitted a total of sixteen possible mitigating circumstances. Part A of Form 2 reflects that the jury unanimously found that nine of those mitigating factors existed. Part B contains no check marks, reflecting that of the remaining seven factors, none were found by any of the jurors to have been mitigating circumstances. Part C also contains no check marks, reflecting that there was no evidence presented substantiating those remaining seven factors.

The dissent is apparently concerned that because there are no check marks on Parts B and C, the jury disregarded the instructions on filling out those forms. The dissent is further concerned that the lack of marks on these forms may indicate that the jury did not properly consider the evidence on these proposed mitigating circumstances. Based on the record before us, we conclude that these concerns are not well founded.

This court has recognized that a jury may generally refuse to believe a defendant's mitigating evidence; however, when there is no question about credibility and when objective proof makes a reasonable conclusion inescapable, the jury cannot arbitrarily disregard that proof and refuse to reach that conclusion. *See Echols v. State*, 326 Ark. 917, 936 S.W.2d 509 (1996), *cert. denied*, 520 U.S. 1244 (1997) (citing *Bowen v. State*, 322 Ark. 483, 911 S.W.2d 555 (1995), *cert. denied*, 517 U.S. 1226 (1996); *Giles v. State*, 261 Ark. 413, 549 S.W.2d 479, *cert. denied*, 434 U.S. 894 (1977)). In the present case, the jury was faced with neither unquestionable credibility nor objective proof that would make a

reasonable conclusion inescapable on any of the remaining seven proposed mitigating factors.

The first of the seven remaining factors was that the capital murder was committed while Roberts was under extreme mental or emotional disturbance. There was no credible evidence of this proposed factor. The second factor was that the murder was committed while Roberts lacked the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law due to a mental disease or defect or alcohol intoxication. There was no dispute on the first part of this factor, as all of the expert witnesses, even those for the defense, opined that Roberts knew right from wrong and therefore had the ability to appreciate the criminality of his conduct. However, there was conflicting testimony as to Roberts's ability to conform his conduct to the requirements of the law.

The third factor was that Roberts, although legally responsible, suffers from an intellectual deficit. This factor, like the first two, was the subject of conflicting testimony. Roberts's experts stated that he had low intellect and functioned like an adolescent. The State's experts, on the other hand, stated that while Roberts had a below-normal intellect, he functioned well in society, he could read and write on a high school level, and he was, as evidenced by his crimes, capable of engaging in a complex series of actions that included his efforts to conceal his crimes. Accordingly, the jury did not act arbitrarily in disregarding this conflicting proof.

The fourth and fifth factors were that as a result of Roberts's brain damage, his ability to control his emotions or impulses has been impaired and that his ability to accurately interpret social cues and communications with other persons has been impaired. Again, these factors were the subject of expert debate. As stated earlier in this opinion, there was no debate among the experts that Roberts had incurred some loss of the brain tissue in his right and left frontal lobes. However, there was strenuous debate about the effect that his brain injury had on his behavior, specifically as it pertained to his ability to control his actions and emotions and to his ability to function in society.

The sixth factor was that Roberts exhibited remorse about Andria's disappearance when interviewed by police. There was specific evidence countering this factor by Agent Jessie, who

stated that any remorse Roberts had was for himself. Jessie testi-fied that the one thing that stuck out in his mind was Roberts's statement that he had managed to ruin *his* life in ten minutes.

Finally the seventh factor was that Roberts cooperated with police by leading them to Andria's body. Again, the evidence on this factor was conflicting. The record reflects that when Roberts was initially interviewed by police, the day after Andria was reported missing, he denied knowing anything about Andria's dis-appearance, and he lied to police about his whereabouts at the time. Roberts did not tell the truth until he was interviewed a second time and then only after he was confronted with the fact that he was being deceptive during the polygraph. The jury certainly could have concluded that Roberts's actions were less than cooperative.

Based on our case law, we cannot say that the jury erred in refusing to believe the defense's mitigating evidence. There was conflicting evidence presented on each of the remaining seven pro-posed mitigating factors. As such, the jury did not arbitrarily disre-gard unquestionably credible and objective proof. Accordingly, there was no error in the completion of the jury forms.

Affirmed.

THORNTON, J., dissents.

RAY THORNTON, Justice, dissenting. Because I believe that Roberts's confession was the result of a false prom-ise to help, I must respectfully dissent. Specifically, I believe that based on the totality of the circumstances, the statements made by law enforcement officials to Roberts coupled with Roberts's vulnerabil-ity led to an involuntary confession that should have been suppressed.

*Guilt Phase*

Statements made while in custody are presumed to be involun-tary, and the burden is on the State to show that the statements were made voluntarily, freely, and understandingly, without hope of reward or fear of punishment. *Stephens v. State*, 328 Ark. 81, 941 S.W.2d 411 (1997). In *Bisbee v. State*, 341 Ark. 508, 17 S.W.3d 477 (2000), we outlined the standards for reviewing the voluntariness of an in-custody confession. In *Bisbee*, we explained:

The State bears the burden of proving by a preponderance of the evidence the voluntariness of an in-custodial confession. *Davis v. State*, 275 Ark. 264, 630 S.W.2d 1 (1982).

\* \* \*

A statement induced by a false promise of reward or leniency is not a voluntary statement. *Clark v. State*, 328 Ark. 501, 944 S.W.2d 533 (1997). For the statement to be involuntary the promise must have induced or influenced the confession. *McDougald v. State*, 295 Ark. 276, 748 S.W.2d 700 (1988).

\* \* \*

As with other aspects of voluntariness, we look at the totality of the circumstances. *Conner v. State*, 334 Ark. 457, 978 S.W.2d 300 (1998). The totality is subdivided into two main components: first, the statement of the officer, and second the vulnerability of the defendant. *Davis, supra.* We have articulated factors which we will look to in our determination of whether the defendant was vulnerable. Specifically, we have held that the factors to be considered in determining vulnerability include: 1) the age, education, and intelligence of the accused; 2) how long it took to obtain the statement; 3) the defendant's experience, if any, with the criminal-justice system; and 4) the delay between the Miranda warnings and the confession. *Conner, supra.*

*Bisbee, supra.*

In order to determine whether Roberts's confession was voluntarily given, it is necessary to review the facts surrounding Roberts's confession. On May 17, 1999, Karl Roberts went to the Polk County Police Station to take a polygraph exam. Following the exam, Officer Ocie Rateliff informed Roberts that the test results established that Roberts had been "deceptive" on the test. Immediately thereafter, Roberts stated that he had "messed up." Officer Rateliff testified that Roberts appeared "teary-eyed" while making this statement. Officer Rateliff also testified that after hearing Roberts's statement he moved his chair closer to Roberts, put his arm around Roberts, and told Roberts that he should "get it off your chest, we'll help."

As the majority correctly notes, the statement "get it off your chest, we'll help" is ambiguous. Because the alleged "promise" is ambiguous, we must look to Roberts's vulnerability to determine whether the officer's statement improperly induced Roberts's confession. *See Pyles v. State*, 329 Ark. 73, 947 S.W.2 d 754 (1997).

A review of the evidence established that Roberts was thirty-one years of age at the time he made the custodial statements. The evidence showed that from the time Officer Rateliff gave Roberts his *Miranda* warnings, upon arriving at the police station, until he was told "we'll help," was two hours, and that from the time Roberts stated that he had "messed up" until his confession was completed, was approximately another two hours. The record does not reveal any prior experience Roberts may have had with the criminal-justice system.

The four hours between the *Miranda* warnings and the completion of the confession following the ambiguous promise "we'll help" are not excessive, but that does not resolve the question of whether Roberts was vulnerable.

I believe that the evidence establishing that Roberts's intelligence level was well below average was significant. Dr. Charles Mallory from the State Hospital testified that he had given Roberts an IQ test and that the results from the test revealed that ninety-five percent of the population would have performed at a higher level than Roberts. Dr. Mallory also testified that Roberts's IQ score of 76 was considered to be in the range of "borderline intellectual functioning." He explained that this meant that Roberts was not mentally retarded, but was of below normal intelligence.

This psychological assessment was echoed by Special Agent Mark Jessie and Officer Rateliff. Agent Jessie was in the interrogation room at the time Officer Rateliff offered his promise and at the time Roberts made his confession. Agent Jessie testified that he considered Roberts to be a "man of below normal intelligence." He also testified that he "would have guessed [Roberts] to be a kid that would have been slow in school."

Officer Rateliff described Roberts as someone who was "a little slower than most people." He also explained that Roberts's voice was "monotone" and "not normal."

Not only was Roberts capable of only "borderline intellectual functioning," I believe it is even more significant that there was uncontroverted evidence that at age twelve Roberts suffered severe brain damage in an accident that destroyed one-fifth of his right frontal lobe and damaged other parts of his brain. Magnetic Resonance Imaging scans of Roberts's brain clearly revealed that a

significant part of his right frontal lobe, as well as the medial aspect of his left frontal lobe, and part of his temporal lobe were missing.[1]

Dr. Lee Archer, a neurologist from UAMS, testified:

.My opinion is that if it were not for the injury that Karl Roberts sustained in 1980 he would not have committed this crime. Prior to Karl's accident in 1980 he had no behavioral problems.

\* \* \*

During my examination of him, Karl acted more like an adolescent than an adult. Adults will make eye contact and will engage in some small talk. Karl avoids eye contact and he makes no small talk.

\* \* \*

There are also some subtle findings that indicate a dysfunction of the brain. His handwriting is very laborious, his speech has a telegraphic quality where he uses just essential words to communicate, and his gait is a little bit abnormal.

From this testimony, it is clear that the combination of a borderline I.Q. and adolescent behavior patterns resulting from severe brain damage made Roberts vulnerable to the ambiguous promise "get it off your chest, we'll help."

Evidence presented at the hearing showed that Roberts, who was emotionally upset during the interrogation, was vulnerable to Officer Rateliff's false promise. Specifically, Officer Rateliff testified that prior to making the statement to Roberts he noticed that Roberts was "teary eyed." Officer Rateliff also testified that he had moved his chair close to Roberts and placed his arm around Roberts shoulder before he promised to "help" Roberts. Officer Rateliff further testified that after he had promised to help, Roberts was "very upset" and "had a quiver in his voice."

Agent Jessie also testified about Roberts's sensibilities. He stated that after Officer Rateliff put his arm around Roberts, and told him that they would help, Roberts "broke down and began

---

[1] Uncontroverted expert testimony showed that such destruction of the frontal lobes produces an effect similar to that suffered by Phineas Gage approximately 150 years ago when a dynamite blast drove a crowbar through his frontal lobes. Before that time Mr. Gage had been a hard-working family man. Although he survived the accident, he became animal-like in his behavior and as a result of scientific study over the century and a half following the injury, the role of the frontal lobes in controlling behavior has become well documented.

to sob." Agent Jessie further explained that Roberts continued to cry for several hours.

Based on the totality of the circumstances, I would conclude that the State did not meet its burden of proving that Roberts's confession was voluntarily given. For that reason, the trial court erred in denying his motion to suppress. Because the confession was involuntarily given, any evidence recovered as a result of that confession would be fruit of the poisonous tree and would therefore be inadmissible.

I also dissent because I believe that *Pyles v. State*, 329 Ark. 73, 947 S.W.2 d 754 (1997), is indistinguishable from the case now on review. In *Pyles*, we were asked to determine whether an officer had made a false promise to Pyles which induced him to confess. The facts surrounding Pyles' confession were outlined in the opinion. We explained:

> Following a long interrogation of several hours by other officers, Officer Howard began to interrogate Pyles. Officer Howard testified that he knew Pyles prior to the arrest through baseball and that he visited with Pyles about that. He testified that he told Pyles that it was important for him to tell the truth and that "they knew he did it." He also testified that he told Pyles that he did not believe that Pyles was a cold-blooded killer and that he told Pyles that he would "do everything in the world [he] could for him." Pyles claims that he confessed after Officer Howard made this statement.

*Pyles, supra.*

After reviewing other cases involving confessions, we noted:

> Often it is difficult to determine whether an officer's statement is a promise of reward or leniency, a statement meant to deceive, or merely an admonishment to tell the truth. In *Wright v. State*, 267 Ark. 264, 590 S.W.2d 15 (1979), we allowed a statement by an interrogating officer that, "things would go easier if you told the truth." However, in *Tatum v. State*, 266 Ark. 506, 585, S.W.2d 957 (1979), we determined that the statement, "I'll help you any way that I can" was a false promise. On several occasions, we have held statements to be false promises: when the officer claimed he "would do all that he can," *Hamm v. State*, 296 Ark. 385, 757 S.W.2d 932 (1980), and when the officer said "I'll help all that I can." *Shelton v. State*, 251 Ark. 890, 475 S.W.2d 538 (1972).

*Pyles, supra.*

We then went on to consider Pyles' vulnerability, and wrote:

> In the case before us, the record reflects that Pyles became emotional when he was interrogated by Officer Howard. Both Pyles and Officer Howard testified that Pyles held the officer's hands and wept. Pyles testified that he was emotional and tired from a long interrogation. The statement that Officer Howard made closely resembles those which we held unacceptable in *Tatum, Hamm,* and *Shelton, supra.* Therefore, we must conclude that the officer's action constituted a false promise that resulted in an involuntary confession.

*Pyles, supra.*

*Pyles* is squarely on point with the case now under consideration. Specifically, the statements made by the officers in each case amounts to a wide sweeping promise of "help." The criminal defendants in both cases were emotionally distraught and subject to police inducement. Moreover, the officers in both cases used the criminal defendant's vulnerability to induce a confession. Because *Pyles* is factually indistinguishable from the case now on review, and because we determined that the confession in *Pyles* should have been suppressed, I conclude that Roberts's confession should have been similarly suppressed. I dissent and would remand this case for a new trial on the charges.

## Penalty Phase

I must also dissent from the imposition of the death sentence upon Roberts in the penalty phase because I cannot say with certainty that the verdict forms were completed in accordance with statutory requirements. We have consistently held that the death sentence may not be imposed unless the jury makes the required statutory finding. *Camargo v. State,* 327 Ark. 631, 940 S.W.2d 464 (1997).

In the case now before us, Form 2 sections "B" and "C," relating to mitigating circumstances, were left blank. Because a significant portion of Form 2 is blank, we cannot determine whether the jury properly considered the mitigating evidence prior to imposing the death penalty. The majority contends that while there was conflicting evidence with regard to the existence of seven mitigating circumstances, the jury did not have to consider those circumstances as having been established. That is correct. But, the jury was statutorily required to consider the

evidence concerning those seven mitigators, and to make a written decision as to whether or not they had been established. This the jury did not do. Having failed to use Form 2B to indicate whether some jurors believed some of those mitigators existed, but that the panel did not agree that they were mitigators, the jury also failed to use Form 2C to indicate that the evidence supporting the other mitigators was not sufficient to prove the existence of those mitigators. In summary, after finding the existence of nine mitigators as marked on Form 2A, the jury did not execute any written disposition of the remaining seven mitigating circumstances for which some evidence was presented. The requirement to make this analysis is clear in Form 2B and 2C, and the jury made no use of those forms. In my view, the failure to make written findings as to the validity of those seven mitigators constitutes error requiring a new sentencing trial. Because we cannot determine whether the jury considered the seven mitigating factors for which some evidence was presented, I cannot join the majority opinion in approving Roberts's sentence even if there were no error in the guilt phase of the trial.

I respectfully dissent.