2010 Ark. App. 278

**Monty Lee STIDAM, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 09–779.**

Court of Appeals of Arkansas.

March 31, 2010.

Harvey Harris, North Little Rock, for Appellant.

Rachel M. Hurst, Atty. Gen., for Appellee.

DAVID M. GLOVER, Judge.

Appellant, Monty Stidam, was convicted by a Benton County jury of rape and sexual assault in the second degree. The victim was Stidam's three-year-old nephew, J.S. Stidam was sentenced to the Arkansas Department of Correction for forty years and twenty years respectively, with the sentences to be served consecutively. On appeal, Stidam contends that the trial court erred in denying his motions for directed verdict; in admitting what he deems unreliable, testimonial child-hearsay statements made by the victim; and in denying his motion to suppress his custodial statement. We affirm Stidam's convictions.

## I. Trial Testimony

At trial, Linus Shockley, J.S.'s father, testified that Stidam was his half-brother, and that at the time of the incident, his family lived about fifty yards away from where Stidam and their mother lived. Shockley stated that on the day in question, December 3, 2007, he and J.S. had gone to his mother's house to visit, and that Stidam was the only person there. Shockley said that he asked Stidam to watch J.S. while he went back to his house to get something to eat; that he had left J.S. with Stidam "a lot" before; that he was gone for about five minutes; and that when he returned, the television was on in the living room but Stidam and J.S. were not in the room. He said that he went to Stidam's room; that the door was closed; that he opened the door; and that Stidam jumped up, pulled his pants up, and ran out the door. Shockley testified that the first thing he saw when he opened the door was Stidam standing up; that Stidam's pants were down "a little below" his bottom; that J.S. was lying on the bed; that Stidam appeared to be aroused; and that J.S. was scared, upset, and crying. When he asked J.S. what was going on, he stated that J.S. told him that Stidam "humped" him. Shockley said that J.S. was crying when he told him that Stidam "humped" him, and that as a result of that statement, Shockley called the police.

Benton County Sheriff's Office Corporal Diane Spain testified that she met Shockley at the Rogers Police Department; that he told her what happened at that time; and that it was decided to take J.S. to St. Mary's Hospital. She said that she, Shockley, his wife, and J.S., all went into the exam room at the hospital; that the doctor came in and asked J.S. what Stidam had done to him; and that J.S. told the doctor that Stidam had "humped" him. Spain testified that this was the first time she had heard that statement; she said that Shockley and the doctor had talked outside the exam room, but she did not overhear their conversation. Spain said that Shockley appeared to be in shock, but that he was calm and very matter-of-fact. Spain also repeated those facts Shockley had earlier related.

Debra Sensor, a registered nurse and a certified sexual-assault nurse examiner, testified that she performed an acute-rape kit on J.S. and that there were no findings on that exam; however, Sensor stated that was not unusual, as less than ten percent of children will have any signs of trauma after a sexual assault. Sensor explained that the anus is very elastic, and the absence of physical injury did not mean that there was no penetration.

Dr. Kristi Kaemmerling, the attending physician in the emergency room at the time J.S. was taken to the hospital, testified that prior to talking to J.S., she spoke with Shockley, who reported to her that Stidam had "humped" J.S. Dr. Kaemmerling testified that she then went in and talked to J.S., who told her that his uncle had "humped" him. Dr. Kaemmerling said that she performed a general physical exam but did not notice any overt physical trauma.

Jeremy Felton, a criminal investigator for the Benton County Sheriffs Office, testified that he was contacted regarding a possible sexual-assault victim, and he arranged to meet the Shockleys at the Children's Advocacy Center. Felton stated that J.S. would not go back to talk to him, but that a medical exam was performed on J.S. and Felton spoke with his parents. Felton, likewise, repeated Shockley's testimony based on his interview of Shockley.

Felton testified that after speaking with Shockley, he contacted the men's mother, who told Felton that Stidam might have gone to Missouri. He said that a warrant was issued for Stidam on December 20, 2007, and that he was arrested in Barry County, Missouri, on January 2, 2008. Felton testified that he drove to Missouri on January 3 to interview Stidam; that he was not dressed in his uniform or carrying his gun at the time of the interview; that Stidam was wearing handcuffs during that interview; that prior to interviewing him, he read Stidam his *Miranda* rights; and that he then conducted an interview. Felton testified that Stidam signed the *Miranda* warnings. Felton said that Stidam was eighteen at the time of the interview; that he was unaware that Stidam had a criminal history; and that Stidam's answers were "weak." Felton denied that he lied to Stidam during the interview, but he did say that he phrased the questions in a certain way. Felton stated that he told Stidam that he had talked extensively to Shockley and J.S., and Stidam told him that he just wanted to get the interview over with and go home.

The transcript of Felton's interview with Stidam indicated that Felton read Stidam's rights to him, and that Stidam stated that he understood each one. Stidam also agreed to answer Felton's questions without an attorney being present. At first, Stidam stated that he just wanted to "get this over with"; Felton told Stidam that he just wanted him to be honest with him, to which Stidam replied that he was being truthful. Stidam denied that his pants were around his thighs when Shockley walked in; he also denied that he was pulling up his pants or that he had an erection. Stidam eventually admitted during the interview that he touched J.S. in a "non-right" way, but he denied that he took J.S.'s clothes off. He denied touching J.S.'s penis. Stidam then told Felton that he knew he could not make him believe him because two other people had already told him something different. Stidam then told Felton that he began touching J.S. everywhere inside his pants and that he got an erection, and that was when Shockley came into the room and began asking if Stidam had been touching J.S. and threatening to kill him. Stidam said that he did not make J.S. touch him; that he was not masturbating during this time;

and that he did not pull his own pants down and begin rubbing himself. However, Stidam said that he touched J.S.'s butt and felt his anus, but he denied sticking his finger or his penis into J.S.'s anus. Stidam then admitted that he stuck his finger into J.S.'s anus for about five seconds, although he could not say which finger or how far he penetrated. Stidam said that aroused him, he got an erection, he was touching himself, Shockley came in, and Stidam "flipped out." Stidam said that he "humped" J.S. once, and that he stuck his penis inside J.S.'s butt.

After the State rested, Stidam moved for and was denied a directed verdict. Stidam then testified in his own defense. He stated that he was nineteen years old; had a ninth grade education, although he was in special-education classes; and understood the charges against him. He denied raping or sexually assaulting J.S. Stidam said that Shockley came into his bedroom and asked what he was doing, to which he replied, "nothing." He said that Shockley then told him that if he found out that he had done something to his kid, he would kill Stidam. Stidam said that he continued to say "no," but Shockley continued asking, so he left.

Stidam said that Officer Felton interviewed him in the Barry County jail; that he was in handcuffs at the time; that he remembered Felton reading him his *Miranda* rights; that he did not understand that he did not have to talk to Felton; and that he thought that when Felton told him that he had a right to an attorney, he meant that he had the right to an attorney when he went to court. Stidam said that he was truthful with Felton at first when he asked if he did anything and he told him "no," but that Felton just kept on and on, "torturing" him, so he finally told Felton what he wanted to hear because Felton kept telling him that he knew he had done it. Stidam testified that he did not do anything to J.S., but that he had admitted to Felton that he had touched J.S.

On cross-examination, Stidam testified that he had taken J.S. to his bedroom to watch television, and that he was in the middle of changing the channel when Shockley walked in the room. Stidam said that his pants were down a little because he was getting dressed; he said that he had an erection because he had just woken up and had to go to the bathroom. Stidam said that J.S. was on the bed watching television, and that his pants were not down. He said that he guessed that Shockley asked him if he had touched J.S. because he had an erection.

### Denial of Directed–Verdict Motions [1]

At the close of the State's case, in his motion for directed verdict, Stidam argued that the State had failed to prove beyond a reasonable doubt that Stidam engaged in deviate sexual activity with J.S. and that J.S. was less than fourteen years of age. He also argued that his confession was coerced and was not corroborated; that the State presented no physical evidence; that the State did not explain what "humping" meant; that statements made by J.S. were hearsay that should be excluded; and that he was not given the right to confront J.S. This motion was denied.

After Stidam's testimony, in his renewal of his motion for directed verdict, Stidam stated that the State had failed to prove that he had raped J.S. because it

1. Although Stidam made directed-verdict motions with regard to both the second-degree sexual assault allegation and the rape allegation at trial, on appeal he only challenges the sufficiency of the evidence to support the rape conviction; therefore, any sufficiency argument with regard to the second-degree sexual assault conviction has been waived.

had failed to prove that he engaged in deviate sexual activity and that J.S. was less than fourteen. He also argued that the only evidence presented consisted of two highly unreliable statements; that there was no physical evidence to corroborate the confession; and that Stidam's right to confront witnesses was violated. This motion was again denied.

◼ This court treats the denial of motions for directed verdict as a challenge to the sufficiency of the evidence. *Hull v. State*, 96 Ark.App. 280, 241 S.W.3d 302 (2006). In *Terry v. State*, 366 Ark. 441, 442, 236 S.W.3d 495, 496–97 (2006) (citations omitted), our supreme court set forth the standard of review for challenges to the sufficiency of the evidence:

> We treat a motion for a directed verdict as a challenge to the sufficiency of the evidence. When reviewing a challenge to the sufficiency of the evidence, this court assesses the evidence in a light most favorable to the State and considers only the evidence that supports the verdict. We will affirm a judgment of conviction if substantial evidence exists to support it. Substantial evidence is evidence which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. Circumstantial evidence may constitute substantial evidence to support a conviction. The longstanding rule in the use of circumstantial evidence is that, to be substantial, the evidence must exclude every other reasonable hypothesis than that of the guilt of the accused. The question of whether the circumstantial evidence excludes every other reasonable hypothesis consistent with innocence is for the jury to decide. Upon review, this court must determine whether the jury re-

sorted to speculation and conjecture in reaching its verdict.

A person commits rape if he engages in sexual intercourse or deviate sexual activity with another person who is less than fourteen years of age. Ark.Code Ann. § 5–14–103(a)(3)(A) (Supp.2009). "Deviate sexual activity" is defined as "any act of sexual gratification involving [8the penetration, however slight, of the anus . . . of a person by the penis of another person; or the penetration, however slight, . . . of the . . . anus of another person by any body member . . . manipulated by another person." Ark.Code Ann. § 5–14–101(1)(A) and (B) (Supp.2009).

◼ On appeal, Stidam argues that the State failed to prove that there was any penetration of J.S. by him because there was no physical evidence of penetration when he was evaluated by Debra Sensor or Dr. Kaemmerling. We cannot reach the merits of this argument because Stidam did not make the particular argument he makes on appeal to the trial court. At trial, Stidam argued that the State failed to prove that he engaged in deviate sexual activity with J.S. While penetration is one component of deviate sexual activity, Stidam did not argue below what he now argues on appeal—that if penetration had occurred, there would have been physical signs of the penetration, and because there were no physical indications of penetration, the State failed to show penetration. In order to preserve a challenge to the sufficiency of the evidence, a defendant must make a specific motion for a directed verdict that advises the trial court of the exact element of the crime that the State has failed to prove. *Pratt v. State*, 359 Ark. 16, 23, 194 S.W.3d 183, 187 (2004). For this reason, Stidam's sufficiency challenge is not preserved for our review.

*Admission of Child Hearsay Statements*

█ Stidam also argues that J.S.'s statements to his father and Dr. Kaemmerling that Stidam "humped" him were unreliable and testimonial, and should have been excluded. He further argues that allowing the statements violated his right to confront witnesses.

█ Citing Arkansas Rule of Evidence 804(b)(7)(A), Stidam argues that child hearsay is presumably unreliable. Stidam's reliance upon this hearsay exception is misplaced. The hearsay exceptions under Rule 804 apply only when the declarant is unavailable. In this case, the trial court never declared J.S. to be unavailable as a witness; therefore, the hearsay exception upon which Stidam relies has no application. Rather, the trial court found that J.S.'s statements to his father and Dr. Kaemmerling were hearsay exceptions under Rule 803(2) (excited utterance) and Rule 803(4) (statement for purpose of medical diagnosis or treatment), where the availability of the witness is immaterial. Stidam does not challenge the trial court's determinations that the statements fall under these particular hearsay exceptions on appeal. Furthermore, because J.S. was never declared to be unavailable as a witness, Stidam could have called J.S. as a witness to cross-examine him about his statement; however, he chose not to do so. Stidam had an opportunity to confront J.S. and chose not to do so; therefore, his confrontation challenge is unpersuasive.

## II. Suppression Hearing Testimony

At the hearing on the motion to suppress his confession, Officer Jeremy Felton's testimony was almost identical to his testimony at trial. However, Felton additionally testified at the suppression hearing that after he read Stidam his rights, he never told him what to say, but only told him that he wanted him to tell the truth. Felton said that Stidam seemed calm and collected during the interview, that he did not notice Stidam shaking, and that Stidam did not seem nervous while he was being read his *Miranda* rights.

On cross-examination, Felton said that he had the rights form turned toward him, so he just filled in what answer Stidam gave him; although he did not have Stidam initial each right, Stidam did sign the rights form. Felton said that Stidam seemed to understand everything and never paused or wavered. Felton said that the interview was about forty-five minutes long; that he was not wearing a gun; and that he was not in uniform during the interview. He said that Stidam was eighteen, and Felton was unaware of Stidam's educational background at the time of the interview. Felton admitted at the suppression hearing that he had lied to Stidam during the interview when he told him that he had personally spoken with J.S. and J.S.'s father. Felton said that he was insistent on getting the truth out of Stidam; that he had determined that Stidam was lying at the beginning of the interview; and that at the end of the interview Stidam said that he had raped J.S. Felton said that all he wanted was the truth, and that he did not want Stidam to make anything up or say something just to please him; however, Felton testified that he determined that Stidam was lying because his story did not match what Felton wanted to hear.

Dr. Robin Ross, a psychiatrist, testified at the hearing that she evaluated Stidam on April 23, 2008; that he was cooperative and was able to look at her; that he had normal speech and no abnormal motor activity; and that he was able to give appropriate answers to questions. Dr. Ross said that in Stidam's account of the offense, he said that the deputy kept making him mad and "going on and on," so he just

S.W.2d 702 (1996). Although he was only eighteen, the testimony was that Stidam was read his constitutional rights, waived them, and agreed to speak with Officer Felton. The interview was not unduly lengthy, and there was no evidence presented that Stidam was promised anything in return for making a statement or that he was coerced into making a statement. While it is true that Officer Felton lied to Stidam about having spoken with J.S. and Linus Shockley, law-enforcement officers are permitted to use psychological tactics and coercive statements so long as such are not calculated to obtain an untrue statement and the defendant's will is not totally overborne. *Conner v. State*, 334 Ark. 457, 982 S.W.2d 655 (1998). Here, although Officer Felton told Stidam that he had talked to J.S. and Linus Shockley when he had in fact not done so given the totality of the circumstances, we cannot say that Stidam's statement was involuntary or coerced, or that Stidam did not knowingly and intelligently waive his *Miranda* rights.

Affirmed.

GLADWIN and KINARD, JJ., agree.